# Illinois Official Reports

## Appellate Court

---

### *People v. Guerrero*, 2021 IL App (2d) 190364

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARDO GUERRERO, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-19-0364 |
| Filed | September 15, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 18-CF-1295; the Hon. Jeffrey S. MacKay, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Anthony J. Santella, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Adam J. Rodriguez, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Justices Zenoff and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury convicted defendant, Edwardo Guerrero, of two counts of aggravated battery (720 ILCS 5/12-3.05(a)(1), (c) (West 2018)). The trial court merged the counts and sentenced defendant to five years' imprisonment.

¶ 2    Defendant appeals, raising two issues. First, he contends the trial court erred when it admitted, as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2018)), a witness's prior inconsistent statement. Second, he contends the trial court erred by admitting, under section 115-12 of the Code (*id.* § 115-12), a police detective's testimony describing the witness's prior photographic identification of defendant. We agree with defendant, and, therefore, we reverse and remand.

¶ 3                                    I. BACKGROUND
¶ 4                                    A. The Charges
¶ 5    A grand jury indicted defendant with two counts of aggravated battery, alleging that, on May 25, 2018, defendant struck Algerto Perez in the head with a rock in an alleyway on Wilson Street, a public way, in West Chicago, causing him great bodily harm.

¶ 6                                        B. Trial
¶ 7    Before trial, defendant moved *in limine* to bar the State's witnesses from referring to him by his nickname, "Monster." The court originally granted defendant's motion but later reconsidered its ruling, allowing the State's witnesses to refer to him as "Monster." Additionally, the State told the court it expected Perez to testify he did not remember anything that happened in relation to the battery. Accordingly, the State anticipated laying the required foundation and playing Perez's videotaped statement as substantive evidence under section 115-10.1 of the Code.

¶ 8    The evidence at trial showed that, around 12:51 p.m. on May 25, 2018, West Chicago police officer Blake Bertany responded to Central Du Page Hospital in relation to a dispatch for an aggravated battery. There, he met Perez, who was crying, injured, in pain, and disoriented, and he observed a large bleeding wound above Perez's left temple. He took photographs of Perez's injuries (which were later admitted into evidence and shown to the jury). Before leaving, Officer Bertany asked Perez to come to the police station after Perez's release from the hospital. Perez received eight staples in his head to close the wound and then left the hospital. He did not go to the police station. Later that day, Officer Bertany went to Perez's house on an unrelated matter and again asked Perez to come to the police station. Perez agreed to do so. At the station, Detective Greg Bowers interviewed Perez, and the interview was videotaped.

¶ 9                                    1. *Algerto Perez*
¶ 10   At trial, Perez testified he did not recall what happened on May 25, 2018, did not want to testify, and was not going to answer any questions about the specifics of what happened. He acknowledged, however, that he gave a videotaped statement to the police about the events that led to the charges against defendant. In addition, Perez acknowledged that, the Friday before trial in this case, he pleaded guilty to theft and fleeing and eluding a peace officer and

admitted to violating the probation he received on an earlier manufacture-and-delivery-of-a-controlled-substance conviction. He also acknowledged he received concurrent 30-month prison sentences in exchange for his guilty pleas and was resentenced to a concurrent 30-month term on his probation violation. However, the State had not promised him anything in exchange for his testimony.

¶ 11 When shown the photographs taken by Officer Bertany at the hospital, Perez testified they accurately depicted his injuries.

¶ 12 On cross-examination, Perez testified he did not want to testify because defendant had done nothing to him. He did not call the police on the date of the incident. Instead, the police "showed up and asked [him] some questions," and he felt compelled to cooperate and "tell them something" because of his own legal issues. Additionally, Perez acknowledged he "had a problem with drugs" on the date of the incident.

¶ 13                                    2. *Algerto Perez's Videotaped Statement*

¶ 14 The court excused the jury and asked the State whether it had anything to add to its section 115-10.1 motion. The State informed the court it had met with Perez twice to go over the details of the trial and, although Perez had previously spoken at length about the details of the incident, "it was just really minutes ago before court that he informed [the State] he was going to refuse to testify." The court found Perez's testimony that he did not recall what happened on May 25, 2018, inconsistent with what was going to be depicted in the videotape and, therefore, found his videotaped statement admissible both as impeachment and as substantive evidence under section 115-10.1.

¶ 15 The State published Perez's videotaped statement, which we have reviewed. Perez told Detective Bowers that he, Sergio Beltran, Kevin Alcantar, and Alexis Espinal were sitting outside the La India grocery store. Alcantar went to an apartment complex across the street, stood outside his girlfriend's car, and spoke to her as she sat inside of it. Perez then saw a Chevrolet Tahoe drive through an adjacent alley and saw defendant (whom Perez referred to as "Monster") looking out one of the windows. Perez pointed out defendant to Beltran and Espinal and told them, "We better leave." A short time later, Perez saw defendant, Eduardo "Lalo" Salinas, and a third man, whom Perez knew as "Raf," approach Alcantar on foot, and Lalo hit Alcantar "probably" three times. Perez, Beltran, and Espinal ran to Alcantar's aid. Salinas and Perez squared off but did not begin fighting. Defendant swung his fist at Perez, but Perez was able to dodge it. According to Perez, defendant must have been "ready to do something" before the fight because he pulled a baseball-sized rock out of his pocket and threw it at Perez from close range, striking Perez in the face. Perez started bleeding "a lot" and ran away. Defendant threw two additional baseball-sized rocks, but neither struck Perez. Perez then heard defendant screaming to Salinas and Raf, "Let's go. Let's go. Let's go." (At trial, Perez was not asked to identity defendant in open court.)

¶ 16 During the videotaped interview, Perez recalled speaking with Officer Bertany at the hospital. He recalled he was with Beltran at La India but had difficulty recalling who else he was with. When reminded he was with "Kevin," he provided Kevin's last name. Additionally, he recalled some details of what defendant, Salinas, and Raf were wearing: defendant wore a black T-shirt and baggy dark-blue shorts, Salinas wore a gray T-shirt across his face, and Raf wore skinny jeans and a "hoodie." (Later in the interview, however, he stated he could no longer remember what Raf wore.) The recording of the interview also shows that Detective

Bowers drew a map of the area, and Perez indicated on the map where the altercation took place.

¶ 17                                3. *Sergio Beltran*

¶ 18     The State also presented the testimony of Beltran, who told the State just before his testimony that "he didn't see anything." The State did not inform the court, like it had with respect to Perez, that it intended to introduce a statement Beltran made to Detective Bowers and Detective Daniel Herbert on May 29, 2018, as substantive evidence under section 115-10.1 of the Code.

¶ 19     Beltran testified that, on May 25, 2018, he was outside La India with Perez, Espinal, and Alcantar. He testified he did not see anything that day and "[did not] know what [the State] want[ed him] to testify about." The State attempted to elicit details regarding the incident, and the following colloquy ensued between the State and Beltran:

"Q. You met with police officers and discussed this incident, correct?

A. Yeah.

Q. And you also met with my partner and I and discussed this, correct?

A. Yes.

Q. You talked to my partner *** several times on the phone.

A. Yes.

Q. Okay. And you spoke with us today before court?

A. Yeah.

Q. And you told us that you were going to testify in court that you didn't see anything, correct?

A. Yeah.

Q. Well, let me ask you this, you did—as you sit here right now, you're saying you didn't see anything that day, correct?

A. Yeah.

Q. Back on [May] 29th, 2018, which was a few days after the 25th when you were hanging out at La India, did you speak to Detective Bowers and Detective Herbert from the West Chicago Police Department?

A. Yeah.

* * *

Q. And [the detectives] came to your house, correct?

A. Yeah.

Q. And you lived in West Chicago at that time?

A. Yep.

Q. Okay. They asked you questions about the incident that happened with [Perez], correct?

A. Yeah.

Q. And you gave them answers and sort of had a conversation, correct?

A. I just—I just gave them like—I just told them that I was there, but I had told them that I didn't see nothing too.

Q. And at some point [the detectives] showed you photos of two individuals, correct?

A. Yeah.

Q. And one of them was the defendant?

A. Yeah.

Q. *** Did you know the defendant's real name before this court case?

A. No.

Q. How did you know him by? What name did you know him by?

A. Monster.

Q. And do you see Monster in the courtroom today?

A. Yeah.

Q. Can you point to him and identify an article of clothing he's wearing[?]

A. A black suit.

Q. Can you please point in the direction that he's sitting[?]

A. That way.

[ASSISTANT STATE'S ATTORNEY (ASA)]: Judge—

[BELTRAN]: I mean, I think that's him. I don't know, I think.

[ASA]: Judge, may the record reflect the in[-]court identification of the defendant[?]

[DEFENSE COUNSEL]: No, Judge, I would object. He's hesitant about it.

THE COURT: You know what, I'm going to let the record reflect the in[-]court identification. The witness initially answered yes, that's him, and then after a pause said, well, I think that's him. So I'm going to let the record reflect that's the in[-]court identification of the defendant.

* * *

Q. Did the police show you photographs on May 29th of 2018?

A. Yeah.

Q. How many photographs did they show you?

A. Three.

Q. Three photographs?

A. Yeah.

Q. Okay. Was one of those photographs a photograph of the defendant.

A. Yeah."

Later, the State continued this line of questioning, as follows:

"Q. Now, I know you said today that you didn't say some things to the police, but let me ask you this, at some point while [Alcantar] was gone while you were outside, did you see a vehicle drive by?

A. No.

Q. You did not see a vehicle drive by?

A. No.

Q. Did you tell the police that you saw a vehicle drive by?

A. No.

Q. Okay. Did you see the defendant on May 25th, 2018?

A. No.

Q. But in your conversation with the police, you told the police that you saw a vehicle drive by, and that the defendant was in that vehicle, correct?

A. No.

Q. Did you see three individuals approach *** Alcantar after he had walked away from La India?

A. No.

Q. But you told the police that you saw three individuals go up to [Alcantar], and one of them hit [Alcantar], correct?

A. Nope.

Q. Did you see the defendant pull rocks out of his pocket and throw them at *** Perez?

A. Nope.

Q. Okay. But you told Detective Bowers and Detective Herbert on May 29th, 2018[,] that you saw that, correct?[1]

* * *

Q. Did you, yourself, get up and go over to where *** Alcantar was as well as *** Perez, the defendant, and another individual named [Salinas]?

A. No.

Q. But you told the police you did, correct?

A. No.

* * *

Q. Okay. And [Salinas is] friends with the defendant, the person you referred to as Monster, correct?

A. I don't know that.

Q. But you told the police that they were, correct?

A. I never said that.

Q. Now, outside of La India then on May 25th, 2018[,] after [Alcantar] walked away, you said you didn't know where he went, correct?

A. Yeah.

Q. But you knew he was somewhere in the area, correct? You just didn't have a good view of him?

A. No. To be honest I thought he had gone to his house or something.

---

[1]Defendant objected here to the form of the questions that had been posed by the State, arguing the State was not giving Beltran the "opportunity to explain himself." The court overruled the objection. The report of proceedings does not show that Beltran answered the question. Instead, the State asked a new question.

Q. Okay. But you told the police that he walked across to an apartment building parking lot area and was speaking with a girl, correct?

A. No.

* * *

Q. Now, one of the individuals punched your friend [Alcantar] in the face, correct?

A. I don't know.

Q. But you told the police that [Salinas] *** punched your friend [Alcantar] in the face, correct?

A. I never said that.

Q. Okay. And *** Perez ran over to defend [Alcantar], correct?

A. I don't know.

Q. Well, you stated that you didn't know where [Alcantar] left [*sic*] after he got up and left?

A. Yeah, yeah.

Q. Correct? So at some point, though, [Perez] got up and left, correct?

A. Yeah.

Q. So are you saying you, as you sit here today, you're saying you didn't see where he went?

A. No, I mean, I ain't going to go follow him or if he wants to leave, like, he can leave. I ain't going to go follow him.

Q. Okay. But you told the police you saw him run over to the parking lot where [Alcantar] was to help [Alcantar] after he got punched, correct?

A. Nope.

Q. Did you see the defendant then swing and punch towards *** Perez?

A. No.

Q. But you told the police that you saw Monster swing at [Perez] several times and miss, correct?

A. Yeah, I never said that.

Q. Did you observe the defendant reach into his pocket?

A. No, I ain't seen nothing.

Q. But you told the police that you saw the defendant reach into his pocket, correct?

A. No.

Q. Did you observe the defendant pull three rocks out of his pocket?

A. No.

Q. Okay. But you told the police that the defendant pulled three rocks out of his pocket, correct?

A. No.

Q. Did you see the defendant throw a rock and miss, but eventually throw another rock and strike *** Perez in the side of the head?

A. No.

Q. But you told the police that you saw the defendant throw a rock, miss, and then throw another rock and strike [Perez] on the side of the head, correct?

A. No.

Q. And you told the police that the rock was thrown from a short distance away meaning a short distance between the defendant and [Perez], correct?

A. No."

¶ 20    Later on May 25, 2018, after everyone left La India, Beltran saw Perez, who had been to the hospital, and saw eight staples in his head.

¶ 21    On cross-examination, Beltran confirmed that, on May 29, 2018, he spoke to the police at his house and told them he did not witness anything. The police did not ask him to give a written or electronically recorded statement. The police never showed Beltran their notes of the conversation or asked him to sign anything. He spoke to the State's Attorney's office the night before his testimony and told them he did not see anything. He also spoke to the State's Attorney's office the morning of his testimony and again told them he did not see anything.

¶ 22    On redirect, the State expounded on its pretrial conversations with Beltran, and the following colloquy occurred:

"Q. *** Now, you were contacted by my partner, and initially you spoke over the phone, correct?

A. Yeah.

Q. And you were informed that the police said you made statements about this case, correct?

A. Yeah.

Q. Now, and you told her that you didn't see anything, correct?

A. Yeah.

Q. But eventually you went over your statement that you gave to the police with her, correct?

A. Yeah, I think. Yeah.

Q. And then last night when she called you again, you said you didn't see anything, correct?

A. Yeah.

* * *

Q. Okay. Now, this morning [c]ounsel asked you some questions about talking to us outside in the room attached to the courtroom, correct?

A. Yeah.

Q. And you did admit that you spoke to the police about the events that day, correct?

A. Yeah.

Q. And you also agreed that you knew the incident that we were talking about where [Perez] got hurt, correct?

A. Yeah.

Q. And you agree that you were hanging out in front of La India, with [Perez], [Alcantar], and [Espinal] on May 25th, correct?

A. Yeah.

Q. You also said that [Alcantar] did get up and go talk to a girl, but you didn't see exactly where he went, correct?

A. I just said he got up and left.

Q. Okay. And you actually said this morning that you did see a car drive by, but you weren't paying attention to what the make or model was, correct?

A. Yeah.

\* \* \*

Q. Now, you said a couple times and when [c]ounsel asked you about talking to the police about the incident that you didn't tell them any details of the statement, correct?

A. Yeah.

Q. Okay. But this morning you did tell Detective Bowers [']I didn't know you guys were going to put all that in the report,['] correct?

A. No.

Q. You never said that this morning?

A. Nah."

¶ 23                              4. *Detective Bowers*

¶ 24        Detective Bowers testified that, on May 25, 2018, he spoke to Perez, and, at the time, Perez "was upset, kind of almost on the verge of crying." He observed a laceration on the side of Perez's head. Perez had a difficult time speaking because of the incident. Though Detective Bowers originally had difficulty understanding Perez as Perez told him where the incident occurred, he eventually learned it occurred in an alley by the Wilson Avenue apartments, which was accessible to the public.

¶ 25        During his investigation, Detective Bowers attempted to speak with defendant, who he knew went by the nickname "Monster," at defendant's residence, which was a two or three minute drive from the West Chicago police station. Defendant was not home. Detective Bowers left his card, but defendant never contacted him. At the time, he did not see a sport utility vehicle (SUV) parked at defendant's residence.

¶ 26        On May 29, 2018, Detectives Bowers and Herbert spoke with Beltran about the incident that occurred on May 25, 2018. In addition, Detective Bowers spoke with Beltran just before Beltran's testimony. In regard to those conversations, Detective Bowers testified, entirely without objection, as follows:

"Q. Okay. Now, specifically directing your attention to May 29th of 2018, you spoke to someone by the name of Sergio Beltran?

A. Yes.

Q. You spoke to him with—or at his residence in West Chicago, correct?

A. Yes.

Q. And Detective Herbert was there with you?

A. Yes, he was.

Q. And when you spoke to Mr. Beltran, you spoke to him specifically about the incident that occurred on May 25th of 2018?

A. Correct.

Q. And at that time did he tell you that he was at the area of Wilson Avenue apartments at that time?

A. Yeah. He described initially that he was at the La India store, and which is in that area.

Q. And he indicated he was there with *** Perez, *** Espinal, and *** Alcantar?

A. Correct.

Q. And when you spoke to him, he indicated that [Alcantar] actually went over to the alley by the Wilson Avenue apartments to speak to a girl, correct?

A. Yes.

Q. And he indicated that he saw a large SUV approach?

A. Yes.

Q. And he indicated to you that he observed three males approach his friend [Alcantar]?

A. That is correct.

Q. And he told you that he saw [Salinas] strike [Alcantar] in the face at that time?

A. Yes.

Q. And he told also told you that he saw *** Perez run over across the street where [Alcantar] was, correct?

A. Yes.

Q. And he told you that he saw the defendant swing at *** Perez but miss?

A. Correct.

Q. He told you that he saw the defendant pull three rocks out of his pocket, correct?

A. Yes.

Q. He told you that he saw the defendant strike [Perez] on the side of the head with a rock from a short distance, correct?

A. Correct.

Q. Now, additionally, you spoke to Mr. Beltran today, correct?

A. Yes.

Q. And when you spoke to him, he said to you he didn't know that you guys were going to put all of this in the report, correct?

A. Correct.

Q. And you had a conversation with him about the incident that occurred on May 25th of 2018, correct?

A. Yes.

Q. And he admitted or he stated to you that he did know about what happened that day, correct?

A. Yes.

Q. And he told you that he was hanging out in front of La India that day?

A. Yes.

Q. And today he did tell you that *** Alcantar did get up to move away from where the others were hanging out outside of La India?

A. Yes, he did.

Q. And he told you that he did see a car, but he did not pay attention to what color or what make or model, correct?

A. That's correct.

Q. And he told you that he left the scene after Mr. Perez was hit with the rock, and everybody left the scene at that time?

A. Yes.

* * *

Q. When you spoke to Mr. Beltran on May 29th of 2018, you showed him two photos, correct?

A. Correct.

Q. Who were those two photos of?

A. It was Edwardo [sic] Salinas *** and then *** the defendant ***.

Q. And did *** Beltran identify the two men in those photos?

A. Yes, he did.

Q. Did he identify the two men in those photos as the men that were *** outside of La India in the Wilson Avenue apartments on May 25th of 2018?

A. Yes, he did.

Q. Did he identify the defendant as the person who actually threw the rock and struck Mr. Perez with the rock on May 25th of 2018?

A. Yes."

According to Detective Bowers, Beltran "seemed kind of reluctant to talk to [him]" when he spoke to him the morning of trial.

¶ 27 On cross-examination, Bowers testified that he went to the scene but did not find any blood or rocks. He did not record, electronically or in written form (other than his police report), Beltran's May 29, 2018, statement. Bowers also testified that Beltran was initially reluctant to talk to him. But Beltran later told Bowers "he did, in fact, see things."

¶ 28        5. *Jury Instruction Conference, Closing Arguments, and Verdict*

¶ 29 During the jury instruction conference, the State proposed giving the jury Illinois Pattern Jury Instruction, Criminal, No. 3.11 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.11), which stated as follows:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of; and the witness acknowledged under oath that he made the statement or the statement was accurately recorded by a tape recorder, videotape recording, or a similar electronic means of sound recording.

- 11 -

It is for you to determine what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."

Defendant objected to the instruction, arguing Beltran did not acknowledge his prior statement under oath. The State responded it had laid the required foundation under section 115-10.1, where Beltran's testimony was inconsistent with his prior statement to police, he was cross-examined, his prior statement described events within his personal knowledge, and he acknowledged giving the statement. On the issue of Beltran's acknowledgement of his prior statement, specifically, the State argued that Beltran had generally acknowledged making statements to the police, noting, "despite there being a discrepancy about specific details that he denied telling the police, he did acknowledge under oath that the police came to his house on May 29, 2018[,] he spoke with them about the incident that *** Perez got injured in, *** and was shown photographs." Citing *People v. Sykes*, 2012 IL App (4th) 100769, the State requested the court to exercise its discretion and make a "formal finding" that Beltran acknowledged the statement under oath.

¶ 30    The court gave the instruction, finding as follows:

"I think that based on the testimony I've heard and the evidence that was presented, I think that the elements of [section 115-10.1] have been met regarding the testimony of *** Beltran. He did acknowledge the statement. I'll make the finding that he did acknowledge he made a statement to the police and was inconsistent—his testimony was inconsistent with the statement that he made to the West Chicago Police Department."

¶ 31    During closing argument, the State read the jury IPI Criminal No. 3.11 and argued that Beltran's prior statement could be considered as substantive evidence of what transpired on May 25, 2018. When discussing whether it had proved defendant's guilt, the State referenced Beltran's prior statement. It also commented on the credibility of the witnesses, stating it did not get to choose its witnesses, Perez and Beltran, who lied during their testimony. The State argued, however, that the prior statements of both men established that defendant threw a rock at Perez, striking him in the head and causing him significant injury. In its rebuttal argument, the State again told the jury it could consider Perez's and Beltran's prior statements as if they were their in-court testimony and emphasized the consistency in their statements to police. The State also noted Perez and Beltran were consistent in that they both forgot what happened or refused to testify just before trial, despite the fact they had previously spoken with the police and the State's Attorney's office.

¶ 32    The jury found defendant guilty of both counts of aggravated battery.

¶ 33                                    C. Motion for New Trial

¶ 34    Defendant filed a motion for a new trial, contending, in part, "The Court erred in giving *** IPI [Criminal] No. 3.11 (prior inconsistent statements) as it related to Sergio Beltran. His testimony was not sufficient to show he had actually made the prior statement it is alleged he made." At the hearing on the motion, the State noted it was clear that Beltran admitted to having a conversation with the police officers, testified where and when the conversation occurred, and acknowledged the police showed him photographs but then testified he did not remember what occurred during the incident. According to the State, the jury instruction at issue was designed for situations where a witness says he or she does not remember what

happened but there is clear and substantial evidence that the conversation did occur. The court denied the motion, finding, "the foundation that was laid was sufficient to have [IPI Criminal No. 3.11] given."

¶ 35                                    D. Sentencing

¶ 36     The court merged the counts and sentenced defendant to five years' imprisonment. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38     On appeal, defendant contends that the trial court erred when it permitted Beltran's prior inconsistent statement, as attributed to him by Detective Bowers, to be admitted as substantive evidence. He also contends the court erred by admitting Detective Bowers's testimony describing Beltran's prior identification of defendant.

¶ 39     For the following reasons, we agree with defendant. The trial court erred by permitting Beltran's prior statements to be considered as substantive evidence because Beltran never acknowledged making the statements. Further, it was error to admit Detective Bowers's testimony that, during Beltran's conversation with Detective Bowers, Beltran identified defendant as the person who threw the rock at and struck Perez. Because there is a reasonable probability the result of the trial would have been different had the errors not occurred, we reverse defendant's convictions and remand for a new trial.

¶ 40              A. The Admission of Beltran's Prior Inconsistent Statement
                             as Substantive Evidence

¶ 41     Defendant contends that the trial court erred when it permitted Beltran's prior inconsistent statement to the police, as attributed to him by Detective Bowers, to be considered by the jury as substantive evidence because the State failed to meet the requirements of section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2018)). First, defendant argues the State failed to establish that Beltran had personal knowledge of the events described in the statements, as required by subsection (c)(2) of section 115-10.1 (*id.* § 115-10.1(c)(2)). Defendant maintains that Beltran's testimony made clear he did not see what transpired after Alcantar left La India. Second, defendant argues that Beltran did not acknowledge making the statement at issue, as required by subsection (c)(2)(B) of section 115-10.1 (*id.* § 115-10.1(c)(2)(B)). According to defendant, Beltran's general acknowledgement that he spoke to the police is not sufficient to satisfy subsection (c)(2)(B). Therefore, defendant asserts, Beltran's statements were not admissible as substantive evidence.

¶ 42     This case involves a scenario in which a witness allegedly initially cooperated with law enforcement, provided a statement incriminating the defendant, and, as time passed, disavowed or disowned his or her statement. We have regularly referred to such witnesses as "turncoat" witnesses. See, *e.g.*, *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 65, *abrogated on other grounds by People v. Veach*, 2017 IL 120649. Before addressing the issues presented, we find it helpful to present an overview of how a party can and cannot use a witness's prior inconsistent statements at trial.

¶ 43                        1. *Using Prior Inconsistent Statements at Trial*

¶ 44        Generally, a hearsay statement—an out-of-court statement offered for the truth of the matter asserted—is not admissible unless the statement falls within a recognized exception to the hearsay rule. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001). However, when a witness has previously made a statement and, at trial, testifies inconsistently with the statement, a party may introduce the witness's prior statement, the hearsay rule notwithstanding, for the limited purpose of impeaching the witness's credibility. We have previously set forth the proper method of laying the foundation for impeachment as follows:

> "A proper foundation must be laid before prior inconsistent statements are allowed into evidence. Part of the necessary foundation is asking the witness whether he [or she] made the inconsistent statement. [Citations.] Generally, the questioner must direct the attention of the witness to the time, place, and circumstances of the statement and its substance. [Citation.] The witness must have an opportunity to explain the inconsistency before the introduction of extrinsic evidence of the statement; this requirement prevents unfair surprise and gives the witness an opportunity to explain any inconsistency. [Citations.] Through this process, the opponent to admission of the statement is properly alerted to the existence of the statement and thus is able to cross-examine the witness regarding it. [Citation.]" *People v. Hallbeck*, 227 Ill. App. 3d 59, 62 (1992).

¶ 45        Thus, the procedure to impeach a witness with his or her prior inconsistent statement requires the questioner to (1) direct the witness to the time, place, and circumstances of the statement; (2) use pointed questions to confront the witness with the content of the prior statement, asking whether he or she made the statement; and (3) give the witness the opportunity to explain the inconsistency. *Id.* Once the impeaching party lays the necessary foundation, he or she must complete the impeachment. *People v. Redman*, 135 Ill. App. 3d 534, 542 (1985). To complete the impeachment when the witness denies making the statement, the impeaching party offers extrinsic evidence showing the witness made the statement. *People v. Vinson*, 90 Ill. App. 3d 6, 9 (1980); see also Ill. R. Evid. 613(b) (eff. Oct. 15, 2015) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."). If the party offers live testimony as evidence of the statement, counsel should use leading questions so as to avoid bringing out improper references in the answer. *People v. Grayson*, 321 Ill. App. 3d 397, 407-08 (2001) (noting a party can and should use leading questions to complete impeachment). If the witness admits making the statement, however, the witness's admission completes the impeachment, and no extrinsic evidence is required. See *Vinson*, 90 Ill. App. 3d at 9. When extrinsic evidence is admitted for impeachment, the trial court should instruct the jury that the extrinsic evidence has been received and may be considered only as it affects the witness's credibility. See IPI Criminal No. 3.11.

¶ 46        We note here a party may not ordinarily impeach his or her own witness's credibility by introducing evidence of the witness's prior inconsistent statement. See *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 44. Only when the witness's trial testimony *affirmatively damages* the impeaching party's case is the party permitted to do so. *Id.* Mere disappointment—such as a failure to support the position of the impeaching party—is not sufficient. *Id.*; see also *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982). Rather, "the testimony must give positive aid to the

[opposing party's] case." (Internal quotation marks omitted.) *Wilson*, 2012 IL App (1st) 101038, ¶ 44. In *Weaver*, the supreme court explained the rationale behind this affirmative-damage requirement as follows:

"A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his [or her] testimony has damaged, rather than failed to support[,] the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness'[s] testimony. It is only when the witness'[s] testimony is more damaging than his [or her] complete failure to testify would have been that impeachment is useful." *Weaver*, 92 Ill. 2d at 563-64.

Until 1984, in Illinois, the *only* proper purpose to introduce a witness's prior inconsistent statement was *to impeach his or her credibility*. That changed when the legislature enacted section 115-10.1 of the Code, which created a statutory exception—applicable only in criminal cases—to the general bar against hearsay statements, allowing a party to introduce a witness's prior inconsistent statement *as substantive evidence*. Pub. Act 83-1042, § 1 (eff. July 1, 1984) (adding 725 ILCS 5/115-10.1); see also Ill. R. Evid. 801(d)(1)(A)(2)(b) (eff. Oct. 15, 2015) (codifying section 115-10.1 in the Illinois Rules of Evidence). After section 115-10.1 was enacted, thus permitting a party to offer a prior inconsistent statement as substantive evidence, our supreme court urged courts to rigorously enforce the affirmative-damage requirement so a party could not introduce an oral inconsistent statement as substantive evidence under the guise of impeachment. *People v. Cruz*, 162 Ill. 2d 314, 362 (1994).

¶ 47        Section 115-10.1 states as follows:

"Admissibility of Prior Inconsistent Statements. In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his [or her] testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his [or her] testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein." 725 ILCS 5/115-10.1 (West 2018).

¶ 48    Section 115-10.1 was designed, in part, to protect parties from "turncoat" witnesses who disavow or disown their former statements made under circumstances indicating the statements were likely true. *People v. Martin*, 408 Ill. App. 3d 891, 895 (2011); *Brothers*, 2015 IL App (4th) 130644, ¶ 65. Despite courts' attempts to clear up any confusion and uncertainty, "seasoned attorneys and trial judges still regularly mishandle section 115-10.1 issues when they come up at trial." *Brothers*, 2015 IL App (4th) 130644, ¶ 66.

¶ 49    A prior inconsistent statement is admissible as substantive evidence *only* if the requirements of section 115-10.1 are met. *Id.* ¶ 65. In addition, the prior inconsistent statement must be relevant and material. *People v. Bonds*, 391 Ill. App. 3d 182, 195 (2009), *abrogated on other grounds by People v. Williams*, 235 Ill. 2d 286 (2009).

¶ 50    A statement's consistency is measured against the witness's trial testimony. *People v. Johnson*, 385 Ill. App. 3d 585, 608 (2008). The witness's prior statement need not directly contradict his or her trial testimony to be considered inconsistent. *People v. Flores*, 128 Ill. 2d 66, 87 (1989). For example, a witness's evasive answers, silences, and changes in position (*id.*); inability to recall (*People v. Martin*, 401 Ill. App. 3d 315, 319 (2010)); and omission of "a significant matter that would reasonably be expected to be mentioned if true" (*People v. Zurita*, 295 Ill. App. 3d 1072, 1077 (1998)) at trial have been deemed inconsistent with the witness's prior statements. The determination of whether a statement is inconsistent is left to the trial court's discretion. *Flores*, 128 Ill. 2d at 87-88.

¶ 51    A witness is subject to cross-examination when he or she is placed on the stand, sworn to tell the truth, and responds willingly to questions, but the "mere fact a witness was present and sat still long enough for questions to be put to him [or her]" does not satisfy the cross-examination requirement. (Internal quotation marks omitted.) *People v. Campbell*, 2015 IL App (1st) 131196, ¶¶ 33-34.

¶ 52    If the inconsistency and cross-examination requirements are met, the statement will be admitted if it was made under oath at a trial, hearing, or other proceeding, and, in such cases, the witness need not have personal knowledge of the events described in the statement. *People v. Wilson*, 302 Ill. App. 3d 499, 508 (1998). Or if the prior statement was not so made under oath, it will be admitted if it narrates, describes, or explains an event or condition of which the witness had personal knowledge and it is (1) proved to have been written or signed by the witness, (2) acknowledged under oath by the witness, or (3) proved to have been accurately recorded by some means of electronic recording. 725 ILCS 5/115-10.1(c)(2) (West 2018).

¶ 53    The personal-knowledge requirement in subsection (c)(2) requires the witness to have personally observed the events that are the subject of the statement and not merely recite what the witness has heard about the events from a third person. *People v. Simpson*, 2015 IL 116512, ¶¶ 28-34. Whether the witness had the requisite personal knowledge is not determined from the witness's trial testimony but rather from the face of the statement. *People v. Speed*, 315 Ill. App. 3d 511, 516 (2000). The rationale for making this determination from the witness's statement is to prevent the "turncoat" witness from precluding the admission of the prior statement by simply testifying that he or she did not see or does not remember what happened. Michael H. Graham, Handbook of Illinois Evidence § 801.11, at 957 (10th ed. 2020); see also *People v. Melecio*, 2017 IL App (1st) 141434, ¶¶ 90-91 (noting section 115-10.1 used the past tense—the statement must narrate, describe, or explain an event "of which the witness *had* personal knowledge"—and rejecting the defendant's argument that the witness's present lack

of recollection as to the events described precluded admission under section 115-10.1 (emphasis added and internal quotation marks omitted)).

¶ 54 In this case, the trial court admitted Beltran's statement as substantive evidence under section 115-10.1(c)(2)(B). The parties' dispute centers on the personal-knowledge requirement of subsection (c)(2) (725 ILCS 5/115-10.1(c)(2) (West 2018)) as well as the requirement of subsection (c)(2)(B) (*id.* § 115-10.1(c)(2)(B)) that the witness acknowledge, under oath, making the statement, which we will refer to as the acknowledgement requirement.

¶ 55 The foundational requirements for introducing a prior inconsistent statement as substantive evidence are the same as those for introducing a prior inconsistent statement to impeach a witness, and they serve the same purpose. *Brothers*, 2015 IL App (4th) 130644, ¶ 68; *Hallbeck*, 227 Ill. App. 3d at 62-63. When a party seeks to introduce a prior inconsistent statement under subsection (c)(2)(B), the law diverges on what can occur after the witness is confronted with the statement. As noted, when the prior statement is used solely to *impeach* the witness, the impeaching party *must* complete the impeachment, which occurs either when the witness acknowledges the statement or when the impeaching party offers extrinsic evidence of the statement. *Vinson*, 90 Ill. App. 3d at 9. When, as here, a party seeks to introduce a prior inconsistent statement as *substantive evidence* under subsection (c)(2)(B) by having the witness acknowledge, under oath, making the statement, what occurs next depends on the witness's answer when asked if he or she made it. If the witness denies making the statement, "then that concludes the matter, and the prior statement may *not* be brought out as substantive evidence." (Emphasis added.) *Sykes*, 2012 IL App (4th) 100769, ¶ 37; *People v. Suastegui*, 374 Ill. App. 3d 635, 642 (2007). If the witness acknowledges making the statement, however, the acknowledgement itself constitutes the evidence of the prior statement, and nothing more need be done for the statement to be admitted as substantive evidence, as any further evidence of the statement is rendered cumulative. *Brothers*, 2015 IL App (4th) 130644, ¶¶ 78, 82. Indeed, "a witness's prior inconsistent statements should not be admitted under subsection (c)(2)(B) through the testimony of another live witness." *Id.* ¶ 82.

¶ 56 *Brothers* set forth the basic components of the confrontation required to lay the foundation required under subsection (c)(2)(B) as follows:

" 'Normally, when a prosecutor attempts to lay the foundation for the admissibility of a prior inconsistent statement under section 115-10.1(c)(2)(B) of the Code, the prosecutor would establish the time, place, and date of the statement and then ask the witness whether [he or] she made the statement at issue.' [Citation]. Importantly, this process must be repeated for *all* of the witness's *specific* prior statements that the proponent may wish to offer as substantive evidence under subsection (c)(2)(B). In other words, the witness must be confronted with, and acknowledge making, *each of the specific prior statements sought to be admitted as substantive evidence*. Further, this acknowledgement must be linked to the contents of a specific statement. It is not sufficient, for example, if the witness *merely acknowledges the subject matter of a prior conversation that [he or] she had with another person*." (Emphases added and in original.) *Id.* ¶ 74.

¶ 57 We have also recognized that, in the midst of a jury trial, prejudice could result if the confrontation described above takes place in front of the jury. *Id.* ¶ 72. In *Brothers*, the court described a procedure deemed "the better practice" and explained its rationale as follows:

"To avoid potential prejudice, the jury should not be present when the party seeking to offer the statement under subsection (c)(2)(B) first confronts the witness with the prior statement for purposes of obtaining the witness's acknowledgement that [he or] she made the statement. This is because if the proponent recites the prior statement in front of the jury for the purpose of asking the witness whether [he or] she made the statement, the jury will hear the statement before the acknowledgement requirement of subsection (c)(2)(B) has been satisfied. However, if the witness does *not* acknowledge making the statement after being confronted with it, the statement is inadmissible as substantive evidence. In this scenario, the jury has nonetheless heard the potentially damaging contents of the statement, and depending upon its prejudicial effect, reversible error may have occurred.

    ***

To avoid letting the jury hear a prior inconsistent statement before the witness renders the statement admissible by acknowledging making it, the better practice is to conduct what we will refer to as the 'acknowledgement hearing' outside the presence of the jury. At the acknowledgement hearing, the proponent of the prior statement should confront the witness with the prior statement [as described above]. ***

After the witness has been confronted with, and given an opportunity to acknowledge making, [his or] her prior statements at the acknowledgement hearing, the proponent will know which, if any, of the prior statements may be admissible under subsection (c)(2)(B) based upon the witness's acknowledgement." (Emphasis in original.) *Id.* ¶¶ 72, 74-75.

Then, assuming the witness's testimony before the jury is inconsistent with the prior statement, the proponent of the statement could repeat in the jury's presence what had been done outside the jury's presence, *i.e.*, confront the witness with the specific prior inconsistent statement and ask whether he or she said it. *Id.* ¶ 77. If the witness changes his or her answer in front of the jury, the proponent can present the pertinent portion of the transcript of the acknowledgement hearing as evidence of the prior inconsistent statement. *Id.* ¶ 78. We note that, if a party has reason to believe that a witness will testify inconsistently with a prior statement before he or she takes the witness stand, the party should alert the court and the opposing party so that an acknowledgement hearing can occur outside the presence of the jury. *Id.* ¶ 83; *Sykes*, 2012 IL App (4th) 100769, ¶ 43. But, if a witness surprises counsel by testifying at trial inconsistently with his or her prior statement, the trial court can excuse the jury and conduct a midtrial acknowledgement hearing. *Brothers*, 2015 IL App (4th) 130644, ¶ 80.

¶ 58                                                    2. *This Case*

¶ 59      Before addressing the merits, we note that defendant did not contemporaneously object to Detective Bowers's testimony describing Beltran's prior statement but, rather, objected to IPI Criminal No. 3.11 at the jury instruction conference. Defendant argues his objection to IPI Criminal No. 3.11 and his inclusion of that issue in his motion for a new trial was sufficient to preserve for review the purported error he advances on appeal—the trial court's erroneous admission of Beltran's statement as substantive evidence of defendant's guilt.

¶ 60      As a general rule, to preserve an issue for appeal, a defendant must both raise a *contemporaneous* objection and raise the issue in a posttrial motion. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009). Otherwise, the defendant forfeits the issue and must seek relief under

the plain-error rule, under which he or she carries the burden of persuasion. *People v. Reese*, 2017 IL 120011, ¶ 69. Defendant did not contemporaneously object to Detective Bowers's testimony describing the prior statement given to him by Beltran. Rather, he first contended the State had failed to satisfy the requirements of section 115-10.1 at the jury instruction conference. Arguably, then, it appears he forfeited review of the issue.

¶ 61    However, the State does not argue that defendant forfeited review of the issue. The principles of forfeiture apply equally to the State. *People v. Artis*, 232 Ill. 2d 156, 178 (2009). If there was any forfeiture argument to be made, the State has forfeited it. *Id.* We turn now to the merits of defendant's claim.

¶ 62    Initially, we reject defendant's contention that we should review this matter *de novo*. Generally, a determination on the admissibility of evidence is a matter for the trial court's discretion, to be reversed only when the court abuses that discretion. *People v. Buss*, 187 Ill. 2d 144, 219 (1999). Our supreme court has held that the determination of whether a statement is inconsistent is left for the trial court's discretion. *Flores*, 128 Ill. 2d at 87-88. This court has held that the determination of whether a witness has acknowledged a statement is left to the trial court's discretion. *Sykes*, 2012 IL App (4th) 100769, ¶ 35. We conclude that the determination of whether a witness has personal knowledge of the events narrated, described, or explained in the statement is likewise a matter for the trial court's discretion. Accordingly, we will reverse only if no reasonable person would take the trial court's position. *Peach v. McGovern*, 2019 IL 123156, ¶ 25.

¶ 63    Defendant first argues the State failed to establish Beltran had *personal knowledge* of the events described in his prior statement, as required by subsection (c)(2). According to defendant, Beltran steadfastly denied seeing any of the events that caused Perez's injuries and precipitated the charges brought against defendant. Beltran's denial that he witnessed any of the events, defendant argues, shows he lacked personal knowledge of the events narrated, described, or explained in his prior statements. We disagree.

¶ 64    As noted, the personal-knowledge requirement is to be determined from the face of the witness's prior statement, not his or her subsequent trial testimony. *Speed*, 315 Ill. App. 3d at 516. Beltran's statements establish that the State met the personal-knowledge requirement of subsection (c)(2). His statement was clearly based on his personal knowledge of what he observed and was not merely a recitation of what some third person told him. See *Simpson*, 2015 IL 116512, ¶¶ 28-34. Indeed, the statement (as attributed to Beltran by Detective Bowers) shows Beltran was present at the scene and observed (1) Alcantar speak to a girl by the alley by the Wilson Avenue apartments, (2) a large SUV approach, (3) three men approach Alcantar, one of whom, Salinas, struck Alcantar in the face, (4) Perez run to Alcantar, (5) defendant swing at but miss Perez, and (6) defendant pull three rocks out of his pocket and strike Perez with one of them on the side of his head from a short distance. Beltran's subsequent trial testimony that he did not observe the events could not preclude the admission of the statements under section 115-10.1. See *Speed*, 315 Ill. App. 3d at 516; *Melecio*, 2017 IL App (1st) 141434, ¶ 91.

¶ 65    Defendant next argues Beltran never *acknowledged* under oath that he gave the specific statements attributed to him by Detective Bowers. He admits Beltran acknowledged speaking to the police but nevertheless argues such an acknowledgement—a mere acknowledgement that a conversation about a particular subject matter, in fact, took place—is insufficient to meet

- 19 -

the requirements of subsection (c)(2)(B). Therefore, he argues, the trial court erred by admitting Detective Bowers's testimony about what Beltran told him.

¶ 66    The State responds that Beltran's general acknowledgement that he spoke to the police was sufficient to meet the acknowledgement requirement of the statute. According to the State, Beltran "acknowledged making statements to *** detectives, yet [d]efendant wants this [c]ourt to believe that the only way *** Beltran's statements would be admissible under subsection (c)(2)(B) would be for *** Beltran to say he made the statements but then state those statements were no longer true for some reason." Further, the State argues, given the circumstances, the trial court properly found Beltran acknowledged his statement. We agree with defendant.

¶ 67    *Brothers* is instructive. In *Brothers*, the defendant was found guilty of several charges arising out of an incident during which the defendant entered the trailer of the victim and physically and sexually attacked her over the course of several hours. *Brothers*, 2015 IL App (4th) 130644, ¶¶ 1-2. At trial, the State played for the jury an audio recording of a 911 call in which the victim recounted to the dispatcher certain details of the attack. *Id.* ¶ 11. The victim testified she had no memory of her 911 call and, though she recalled speaking with the responding police officers, she had no memory of the contents of the conversation. *Id.* ¶ 13. She also testified she would not have lied or " 'made something up' " to the police officers or the 911 dispatcher. *Id.* The State then presented the testimony of a police officer who spoke with the victim after the incident, and, as the State attempted to elicit the content of the conversation from the officer, the defendant objected. *Id.* ¶ 17. After hearing argument as to the admissibility of the testimony under section 115-10.1, the trial court admitted the officer's testimony about the content of the conversation, finding that, while the victim's acknowledgement was " 'sketchy,' " she nevertheless acknowledged under oath that she " 'made statements.' " *Id.*

¶ 68    On appeal, we concluded that the officer's testimony about what the victim told him was inadmissible under section 115-10.1, and, therefore, the trial court erred by admitting the testimony. *Id.* ¶ 94. We noted that the State, in response to the defendant's objection at trial, argued the victim had testified under oath " 'that she believed that she had talked to the officer[ ], that she [did] not remember what she told the officer[ ]. And she did say that what she told the officer[ ] would have been truthful, basically saying that she would not have lied to the officer[ ].' " *Id.* ¶ 88. We rejected that argument, finding, "[e]ven if [the victim] had unambiguously acknowledged that she gave [the officer] a detailed account of what happened ***, such an acknowledgement would still be insufficient because section 115-10.1 of the Code speaks in terms of *statements*, not references." (Emphasis in original.) *Id.* ¶ 90; see also *id.* ¶ 92. We explained that the victim's acknowledgement that she spoke to the officer was not sufficient. *Id.* ¶ 90. Rather, the State was required to confront the victim *with what she actually said* to the officer. *Id.* Because the State never did so, the victim's testimony failed to meet the acknowledgement requirement of section 115-10.1(c)(2)(B) and the officer's testimony about what the victim told him was inadmissible as substantive evidence. *Id.* Ultimately, we concluded the error required a new trial on one of the charges but was harmless as to the others. *Id.* ¶¶ 96-116.

¶ 69    Here, like in *Brothers*, the trial court specifically found that the State satisfied the acknowledgement requirement. We acknowledge that this finding was a matter for the court's discretion. *Sykes*, 2012 IL App (4th) 100769, ¶ 35. We nevertheless conclude the court abused its discretion in making it.

¶ 70    Like the witness in *Brothers*, Beltran acknowledged under oath that he spoke to the police at his home on May 29, 2018. Such an acknowledgement, contrary to the State's contention, is insufficient under section 115-10.1(c)(2)(B) of the Code. *Brothers*, 2015 IL App (4th) 130644, ¶ 90. We acknowledge *Brothers* differs from the present case in that the State did not actually confront the witness in *Brothers* with what she actually told the officers, whereas, here, the State confronted Beltran with his specific statement. To be admissible substantively, however, the State was required to elicit from Beltran an acknowledgement that he made the *specific* statement the State sought to admit. *Id.* Otherwise, Beltran's statement would be whatever Detective Bowers said it was. See *People v. McDonald*, 276 Ill. App. 3d 466, 480 (1995) (Wolfson, J., dissenting) ("The operative word in section 115-10.1(c)(2)(B) is 'acknowledge.' The witness must 'acknowledge' the words attributed to him by the police officer, not that he made some unspecified statement. Otherwise, the witness'[s] statement would be whatever the police officer says it is."); see also *Grayson*, 321 Ill. App. 3d at 408 (disagreeing with the majority's decision in *McDonald* and citing Justice Wolfson's dissent with approval). Simply put, when Beltran denied making the statement at issue, his denial "conclude[d] the matter, and the prior statement [could] not be brought out as substantive evidence." *Sykes*, 2012 IL App (4th) 100769, ¶ 37.

¶ 71    In reaching our conclusion, we note the record shows that, before Beltran's testimony, the State had knowledge Beltran intended to testify he did not see or remember anything concerning defendant's attack on Perez. Yet the State never informed the trial court of its knowledge and instead sought to confront Beltran with his prior statement before determining whether he would acknowledge it. This was a procedural misstep. The better practice requires that, in such circumstances, the State inform the court and the defense of the development so that an acknowledgement hearing can take place outside the presence of the jury. *Brothers*, 2015 IL App (4th) 130644, ¶ 74. Otherwise, the parties and the court run the risk—realized here—that the jury will hear testimony that should have been precluded and that damages and potentially prejudices the opponent of the evidence. *Id.* ¶ 72.

¶ 72    We acknowledge Beltran's emergence as a "turncoat" witness during trial hamstrung the State's ability to present the entirety of its intended evidence. However, because the detectives neither had Beltran write or sign a statement nor electronically recorded their conversation, the State was precluded from introducing Beltran's prior statement when he failed to acknowledge he made the specific statements attributed to him. "[S]ection 115-10.1 permits no shortcuts for prior inconsistent statements to become admissible substantively." *Id.* ¶ 92. Further, when the detectives failed to procure extrinsic evidence, other than Detective Bowers's say-so, of Beltran's statement, they left the State in the precarious position of having to elicit an acknowledgement from an uncooperative witness. Nothing that can be gleaned from the record here shows the detectives were in any way precluded from recording Beltran's statement, either in writing or electronically, which would have obviated the State's predicament at trial. See *id.* ¶ 93 (noting prosecutors should foster a working relationship with law enforcement to provide guidance on the effective use of section 115-10.1 and, though the statute is an effective tool, prosecutors cannot wield it unless law enforcement first does its part). Here, Beltran did not acknowledge his prior statements, and, accordingly, the trial court abused its discretion by admitting the evidence substantively.

¶ 73                          B. Beltran's Prior Identification of Defendant

¶ 74        Instead of next addressing the question of whether the trial court's erroneous admission of Beltran's prior inconsistent statement is harmless, we consider defendant's second contention—whether the trial court erred by admitting Detective Bowers's testimony describing Beltran's prior identification of defendant—because our evaluation of whether the first error was harmless requires resolution of that issue.

¶ 75        Defendant argues that the trial court erred by admitting Detective Bowers's testimony describing Beltran's out-of-court identification of defendant as "the person who actually threw the rock and struck *** Perez with the rock." Initially, defendant argues that Beltran's out-of-court identification was not "made after perceiving" defendant, as required by section 115-12 of the Code. He maintains that, as a result, Detective Bowers's testimony was inadmissible because it was neither corroborative of Beltran's identification, nor substantive evidence "in its own right," nor proper impeachment evidence.

¶ 76        The State responds that, "[b]ecause Beltran's prior inconsistent statements were properly admitted, the admission of the specific statements encompassed within those that were related to his prior identification of [d]efendant on May 25, 2018[,] do not constitute error." The State further argues that, under *People v. Neal*, 2020 IL App (2d) 170356, the fact that Beltran testified he did not perceive defendant committing the crime does not invalidate Detective Bowers's in-court testimony about Beltran's out-of-court identification of defendant.

¶ 77        Defendant acknowledges he forfeited review of this issue by failing to raise it at trial or in a posttrial motion. He nevertheless urges us to review it under the plain-error doctrine. The plain-error doctrine is a narrow and limited exception to the forfeiture rule, permitting a reviewing court to review unpreserved errors when a clear or obvious error occurs and (1) " 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' " or (2) the " 'error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Naylor*, 229 Ill. 2d 584, 593 (2008) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Defendant bears the burden of persuasion under both prongs of the plain-error analysis. *Id.* The first step of the analysis is to determine whether error occurred. *People v. Thompson*, 2015 IL App (1st) 122265, ¶ 34.

¶ 78        Section 115-12 of the Code allows the court to admit, as substantive evidence, a person's out-of-court identification of another through the testimony of the person to whom the statement of identification was made, provided certain conditions are met. Section 115-12 states as follows:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2018).

Thus, if the declarant, *i.e.*, the person who made the identification, testifies at trial, is subject to cross-examination, and made the statement of identification after perceiving the person he or she identified, the person to whom the declarant made the statement may testify as to the declarant's out-of-court identification. Our courts have defined statements of identification for purposes of section 115-12 broadly so as to encompass the entire identification process. *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 38.

¶ 79    We first address defendant's argument that Beltran's statement identifying defendant as "Monster" was not made "after perceiving him" because Beltran maintained at trial that he did not observe defendant committing the charged offenses. Essentially, defendant argues that the statute requires the declarant to "perceive" the person he or she identifies committing the offense and, when the identification is made using a photograph, the photograph must be one depicting the person identified committing the offense.

¶ 80    We rejected a similar argument in *Neal*, and we likewise reject it here. In *Neal*, the defendant was convicted of two counts of retail theft and two counts of burglary based on his taking of various items of merchandise from two Meijer stores. *Neal*, 2020 IL App (2d) 170356, ¶¶ 1, 3. The evidence at trial established a Meijer employee at each store created "be on the lookout" bulletins using still photographs of the offender, which were captured as the offender committed the offenses. *Id.* ¶¶ 5-6. A detective took the bulletins to the defendant's last known residence and showed them to the defendant's stepfather, who made a " 'positive identification.' " *Id.* ¶ 15. At trial, the defendant's stepfather testified he did not know whether the detective had shown him pictures and, when the State confronted him with the photographs, he testified he "could not really see them because of vision problems and that they were 'just blurry.' " *Id.* ¶ 16. When pressed, he testified he thought the detective had shown him pictures and, when asked if he identified the person in the pictures as the defendant, he said, " 'I might have. I don't know. I don't remember.' " *Id.* The State recalled the detective, who testified that, when he showed the defendant's stepfather the bulletins, the defendant's stepfather identified the defendant as the person in the photographs. *Id.* ¶ 17.

¶ 81    On appeal, the defendant contended, in part, that the detective's testimony about his stepfather's identification of him as the person in the bulletins was erroneously admitted under section 115-12 of the Code. *Id.* ¶ 30. Specifically, he argued that the language in section 115-12 requiring the out-of-court identification to be made after the declarant had " 'perceiv[ed]' " the person identified actually required the declarant to perceive the person committing the crime. *Id.* ¶ 32. In other words, he argued, the person making the identification must have been a victim of or an eyewitness to the crime, not someone who had seen the accused at some point in the past. *Id.* We rejected the defendant's argument, concluding "the plain language of section 115-12 contain[ed] no limitation as to the persons whose prior identifications of a defendant may be admitted into evidence." *Id.* ¶ 36. Further, we declined to read into the statute a requirement that the identification be made by the declarant " 'after perceiving [the person] committing the crime.' " *Id.* ¶¶ 32, 36.

¶ 82    We agree with the State that, under *Neal*, Beltran's testimony that he did not perceive defendant committing the crime does not invalidate *Beltran's* testimony that he identified defendant in one of the two photographs shown him by the detectives. Defendant attempts to distinguish *Neal* on the basis that, in that case, the photographs shown to the declarant were still photographs from surveillance footage of the defendant committing the crime, whereas, here, the photographs shown to Beltran had no connection to the charged offenses. According to defendant, "The eyewitness/noneyewitness distinction in *Neal* simply does not apply to these facts—the person making an identification under the statute must still 'perceive' the defendant in connection to the crime itself."

¶ 83    We are not persuaded. Nowhere in *Neal* did we place any weight or rely on the fact the still photographs shown to the declarant depicted the offender committing the offense or otherwise connected the defendant to the offense. We will not—as defendant urges—read into subsection

- 23 -

(c) of section 115-12 an additional requirement that the declarant must perceive the person he or she identifies committing the crime, whether that be in person or in a photograph. See *People v. Clark*, 2019 IL 122891, ¶ 47.

¶ 84    Though we find no error in the admission of *Beltran's* testimony relating to his prior identification of defendant as "Monster," we nevertheless conclude the admission of Detective Bowers's testimony that Beltran identified defendant as "the person who actually threw the rock and struck *** Perez with the rock" was error. Here, Beltran testified at trial, he was subject to cross-examination, and his out-of-court identification was made after perceiving defendant, and, therefore, the State met the requirements of section 115-12 to admit Detective Bowers's testimony regarding Beltran's out-of-court identification of defendant.

¶ 85    However, at trial, Beltran acknowledged that the police showed him a photograph of defendant and he identified defendant as "Monster" in the photograph. But he maintained he did not see defendant throw a rock at and strike Perez and never told the police that he did. The State, however, never confronted Beltran with his purported statement to Detective Bowers that he identified defendant *as the person who threw the rock at and struck Perez*. Essentially, then, the admission of Detective Bowers's testimony that Beltran identified defendant as the person who threw the rock at and struck Perez essentially allowed the State to get in through section 115-12 what it could not (or did not even attempt to) get in through section 115-10.1— Beltran's prior statement to police that he saw defendant throw a rock at Perez.

¶ 86    Admittedly, as noted, courts have read section 115-12 broadly to encompass the entire identification process. And, ordinarily, a witness may include with the statement of identification a short summary description of the conduct of the identified person, made contemporaneously with the identification, but "only to the extent necessary to make the identification understandable to the jury." (Internal quotation marks omitted.) *Anderson*, 2018 IL App (1st) 150931, ¶ 42. But in the circumstances present here, the admission of Detective Bowers's testimony as to Beltran's identification of defendant permitted the State to bypass the requirements of section 115-10.1 and admit as substantive evidence Beltran's prior statement to the police. That was error. In reaching this conclusion, we note we are *not* holding that the State could not elicit testimony from Detective Bowers that Beltran identified defendant in the photographs as "Monster."

¶ 87                                          C. Prejudice

¶ 88    Having concluded that the trial court erred by admitting Beltran's prior statement as substantive evidence, we must next determine whether the error was harmless. *Brothers*, 2015 IL App (4th) 130644, ¶ 96. The improper admission of evidence is harmless when there is no reasonable probability the outcome of the trial would have been different had the evidence been excluded. *Id.* ¶ 97.

> " 'When deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *Id.* ¶ 97 (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)).

The State carries the burden of persuasion in a harmless-error analysis. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003).

¶ 89    The State asserts that any error in the admission of Beltran's prior inconsistent statement was harmless. Specifically, the State argues that Beltran's statement was cumulative of Perez's statement and merely confirmed the identity of defendant as "Monster." Further, the State posits, Perez's prior statement, during which he was able to provide several details of the attack, was corroborated by the photographs of his injuries and the officers' testimony regarding their investigation. We disagree.

¶ 90    Preliminarily, we must determine whether Beltran's prior inconsistent statements were admissible to impeach his credibility. See *Wilson*, 2012 IL App (1st) 101038, ¶ 43 (noting an error in admitting a witness's prior inconsistent statement as substantive evidence can be harmless when the statement is admissible as impeachment evidence). As noted, a party may impeach its own witness with his or her prior inconsistent statement only when the witness's testimony affirmatively damages the party's position. *Id.* ¶ 44.

¶ 91    Neither party addressed this issue in their briefs, and, at oral argument, defendant conceded Beltran's prior statement was admissible to impeach his credibility. We reject defendant's concession. See *People v. Nunez*, 236 Ill. 2d 488, 493 (2010) (a reviewing court is not bound by a party's concession). Here, Beltran's testimony that he did not see what happened did not affirmatively damage the State's position, and, therefore, the State could not impeach him with his prior statement. Instead, Beltran's testimony that he did not observe anything merely failed to aid the State's case.[2] In other words, the State would have been no worse off had it not presented Beltran's testimony at all. See *Weaver*, 92 Ill. 2d at 563-64 (impeachment is useful only when the witness's testimony is more damaging than a complete failure to testify at all); *People v. McCarter*, 385 Ill. App. 3d 919, 933 (2008) (finding no affirmative damage to the State's case when the witness "did not offer evidence of [the defendant's] innocence but merely declined to come forward with evidence of his guilt").

¶ 92    We conclude that, if Beltran's prior inconsistent statement and Detective Bowers's recitation of Beltran's identification as "the person who actually threw the rock and struck *** Perez with the rock" had been excluded, the State's remaining evidence—Perez's trial testimony and his videorecorded statement to the police, the photographs of Perez's injuries, Beltran's identification of defendant as "Monster," Detective Bowers's testimony that he knew defendant as "Monster," and the officers' testimony regarding their investigation of the battery—while sufficient to support a finding of guilt (defendant does not argue otherwise), was far from overwhelming. The only evidence that established defendant, in fact, threw a rock at Perez, hitting him in the side of his head and causing him an injury, was Perez's videorecorded prior inconsistent statement. But his contradiction of that statement at trial raises serious doubts as to the truthfulness of both statements. See *People v. Miller*, 2017 IL App (1st) 143779, ¶ 42. Additionally, Perez's status as a convicted felon and his admission to having "a drug problem" on the date of the offense cast further doubt on his credibility as a witness. See *People v. Neely*, 2013 IL App (1st) 120043, ¶ 18 (a witness's prior conviction is admissible to attack his or her credibility in certain circumstances); *People v. Adams*, 259 Ill. App. 3d 995, 1004 (1993) (drug addiction bears on credibility). Of course, it is the trier of fact's responsibility to determine the credibility of a witness, and a judge or a jury could properly conclude Perez's prior inconsistent statement, as opposed to his trial testimony, was

---

[2]Had Beltran testified defendant did not batter Perez or that some other person did, then our conclusion on this point may have been different.

- 25 -

the truth. See *People v. Howard*, 376 Ill. App. 3d 322, 329 (2007). But his credibility issues certainly bear on our conclusion here that the evidence was not overwhelming, increasing the likelihood the erroneous admission of Beltran's prior inconsistent statement prejudiced defendant.

¶ 93 Other than Perez's prior statement, none of the State's remaining evidence tended to prove defendant's guilt. The photographs admitted into evidence corroborated only the fact of Perez's injury, not that defendant caused it. The State presented no physical evidence, such as the rocks allegedly thrown by defendant or blood from the scene. In fact, Detective Bowers testified that he went to the scene and found no such evidence. And Detective Bowers's testimony that he left his card for defendant but defendant never contacted him, despite his proximity to the police station, does not tip the scales in the State's favor. (We note this evidence was the subject of a motion *in limine*, in which the State sought to admit the testimony to impeach defendant's credibility on his affirmative defense of self-defense. See *People v. Graves*, 142 Ill. App. 3d 885, 889-90 (1986). However, defendant never presented evidence to support or argued his affirmative defense.) Simply put, without Beltran's prior inconsistent statement, the State's only evidence tending to show defendant's guilt was contradictory statements from a witness with questionable credibility. Accordingly, we conclude the evidence in this case was not overwhelming.

¶ 94 Admittedly, Beltran's prior statement was cumulative of the videorecording of Perez's properly admitted prior inconsistent statement. See *Brothers*, 2015 IL App (4th) 130644, ¶ 98. However, Beltran's statement was a key focus in the State's case, and it is reasonably likely that their admission contributed to defendant's conviction. Indeed, in its closing argument, the State placed great emphasis on Beltran's prior statement. As the State argued, Perez's and Beltran's statements to the police were nearly identical. Under these circumstances, we conclude there is a reasonable likelihood that the result of defendant's trial would have been different had Beltran's prior inconsistent statement not been admitted. Accordingly, we reverse defendant's convictions and remand this matter for further proceedings.

¶ 95 In sum, this case demonstrates the need to strictly follow the required procedures when a party uses section 115-10.1 to admit a witness's prior inconsistent statement as substantive evidence. When Beltran denied making the specific statement the State sought to have him acknowledge, the State could no longer use the statement as substantive evidence of defendant's guilt. Because the evidence was not overwhelming, we conclude defendant was prejudiced by the erroneous admission of Beltran's prior inconsistent statement. This is particularly true, given that Beltran's prior statement was highly corroborative of—indeed, nearly identical to—Perez's videotaped statement, which was the only remaining evidence tending to prove defendant's guilt. The prejudicial effect of those statements was amplified when the State confronted him with the statement in front of the jury and not at an acknowledgement hearing outside the jury's presence.

¶ 96                                    III. CONCLUSION

¶ 97 For the reasons stated, we reverse the judgment of the circuit court of Du Page County and remand for a new trial.

¶ 98 Reversed and remanded.