2024 IL App (1st) 230820-U

FIRST DISTRICT,
SIXTH DIVISION
November 1, 2024

No. 1-23-0820

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CR 6007101 |
| | ) | |
| ANTONIO VICKERS, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm defendant's convictions and sentences for attempt murder, aggravated battery, and aggravated discharge of a firearm where the evidence at trial was sufficient to support the jury's guilty verdicts, the trial court did not err in admitting identification evidence, defendant's trial counsel was not ineffective, and the trial court did not rely on an improper aggravating factor in imposing sentence.

¶ 2     Following a jury trial, defendant Antonio Vickers was found guilty of attempt first degree murder, aggravated battery, and aggravated discharge of a firearm. The jury also found he personally discharged a firearm while committing attempt first degree murder that proximately caused great bodily harm to another person after the shooting on February 25, 2019. The trial court

sentenced Vickers to 15 years' imprisonment for attempt murder and an additional 25 years' imprisonment for the mandatory firearm enhancement, for a total of 40 years' imprisonment, to be served concurrently with merged sentences of 15 years' imprisonment for aggravated battery and 15 years' imprisonment for aggravated discharge of a firearm. On appeal, Vickers contends (1) he was not proven guilty beyond a reasonable doubt; (2) the trial court erred by allowing impermissible hearsay testimony; (3) his trial counsel provided ineffective assistance; and (4) the trial court considered an improper factor when sentencing defendant. We affirm.

¶ 3                                                      I. BACKGROUND

¶ 4        On February 25, 2019, 65-year-old Adelso Lima was leaving a residential construction project at 1016 North Monticello Avenue in Chicago when he saw a black man in a black hoodie firing a gun at a car parked near the corner of Augusta Boulevard and Monticello. The man fled, shot Lima in the arm and stomach as he ran by him, and continued running north on Monticello. Chicago Police Officers parked in a nearby alleyway heard the gunshots. They saw Vickers, dressed in all black, holding a handgun, running through a vacant lot towards the alley. Officers pursued Vickers, occasionally losing sight of him, until Vickers got in the back seat of an occupied SUV. Officers arrested Vickers but were unable to locate a firearm on his person, in the vehicle, or in the path of flight. At the hospital, Lima identified Vickers in a photo array. Vickers was subsequently charged with attempt first degree murder (720 ILCS 5/8-4(a); 720 ILCS 5/9-1(a)(1)), aggravated battery (720 ILCS 5/12-3.05(e)(1)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1)).

¶ 5                                                      A. Jury Trial

¶ 6        A jury trial commenced May 10, 2022. At trial, Lima testified that on February 25, 2019, he was working on a construction project in a house at 1016 North Monticello Avenue with his cousin Anibal Donis. Around 5:00 p.m. that evening, Lima left the home through the front door

and approached the gate to the sidewalk. As he closed the gate behind him, Lima saw a black man wearing a black hoodie sweatshirt "shooting at the corner of Augusta and Monticello." Lima first testified that he could not see the man's face, but later testified that he could see the man's face because there was nothing covering his face. The man ran by, shot Lima in the arm and stomach, and continued running north on Monticello.

¶ 7        Donis drove Lima to St. Mary's Hospital in his truck and Lima was transferred to Cook County Hospital for treatment of his gunshot wounds. Lima spoke to Chicago Police Officers while recovering at the hospital and identified Vickers in a photo array as "the one who shoot [*sic*] me." Lima placed his initials next to Vickers' photo in the array because he was told to place his initials "next to anyone that looked familiar to [him] or that [he] recognized." Lima said no one forced or threatened him to identify anyone in the photo array. However, when asked to make an in-court identification of the man who shot him three years prior, Lima testified, "[n]o, I just know. I don't remember now."

¶ 8        Surveillance video from a camera affixed to the front of the house at 1020 North Monticello was admitted into evidence. It shows at approximately 5:43 p.m. on February 25, 2019, Lima walks down the front steps of 1016 North Monticello, pauses at the front gate, and then walks through. A man dressed in black walks north on Monticello toward a parked silver car. He comes up to the car from behind, leaves the street to walk on the sidewalk, and approaches the driver's side of the car. His right hand extends towards the car and multiple gun flashes appear from his outstretched arm. The man takes off running north on the Monticello sidewalk towards Lima. As he passes Lima, the man points his right hand at Lima and several more gun flashes appear. The man continues running north as Lima walks back and forth from the gate towards the street. No other individuals walk or run past the house during or immediately after the shooting. Approximately 22 seconds later, four people exit the silver car and flee south and east. Numerous individuals

approach Lima on the sidewalk. Two people in jackets and light-colored pants run north up Monticello past the house. Lima eventually gets into a blue pickup truck that drives north on Monticello.

¶ 9  Anibal Donis testified that Lima left the house they were working on at approximately 5:43 p.m. through the front door. As Lima was closing the front gate, Donis was looking through the window and saw a man "walking going north in front of the fence, and he had a gun shooting" south. The man was "dressed in black," wearing a "pull over with a hood" and black pants. The man ran off and Donis took Lima to the hospital. Donis testified that Lima was not able to work with him after the incident due to the "damage" he suffered from this shooting. Donis further explained that the shooting impaired Lima's ability to communicate and remember things, making his "mind absent" in a way that it was not prior to the shooting.

¶ 10  On February 25, 2019, Chicago Police Officers Jose Hernandez and Michaels were parked in their marked police vehicle in the alleyway between Lawndale Avenue and Monticello, just north of Augusta Boulevard. At around 5:43 p.m., Hernandez heard approximately ten gunshots coming from the direction of Monticello. Hernandez immediately began driving north up the alley and saw "an armed male running towards [his] vehicle," whom he identified in court as Vickers. Vickers was approximately twenty yards away running west through a vacant lot to the east of Hernandez, which was north of 1016 Monticello. Hernandez noted that Vickers was dressed in all black and was "gripping the handle of a handgun *** in his sweater pocket, in his jacket pocket." At some point, Hernandez "had to reverse" and lost sight of him. When Hernandez saw Vickers again, he was closer and "still running towards" him, approximately five to ten yards away. Hernandez testified, "[h]e was running directly towards us. I saw the front of his body. I saw his face, and I saw his hand."

¶ 11  Vickers ran behind Hernandez's vehicle and into another vacant lot that fronted Lawndale.

Hernandez got out of his car and chased Vickers on foot through the vacant lot. When he got to Lawndale, Vickers crossed to the west side of the street and turned south, causing Hernandez to "lose visual" of Vickers for a "few seconds." Hernandez regained sight of Vickers as he continued running south on the west side of Lawndale. Hernandez followed Vickers across Augusta Boulevard onto the 900 block of North Lawndale. Vickers ran to the east side of Lawndale and "jumped into the rear right passenger seat of a black Chevy Equinox." Other police officers arrived at the Equinox at the same time, and they detained the three occupants, including Vickers. Hernandez noted that multiple "community members" arrived at the scene while they were near the Equinox, forming a "large crowd." Hernandez and his teammates searched the detained individuals and the Equinox but did not recover a firearm. Hernandez was also unable to locate Vickers' firearm as he retraced his path back to the alley.

¶ 12        Dashcam video from Hernandez's in-car recording system was admitted into evidence. Hernandez explained that the video shows his vehicle accelerated at 5:43:44 p.m. when he heard the gunshots. The vehicle stopped when he saw Vickers at 5:43:52 p.m., and briefly paused at 5:44:03 p.m. when he exited the vehicle to chase Vickers on foot and his partner "took control of the driver's seat." Surveillance video from a Police Observation Device (POD) camera at 1000 North Ridgeway Avenue was also admitted into evidence. Hernandez explained that the video shows Vickers running southbound on Lawndale Avenue across Augusta Boulevard, Hernandez running after him, and his teammates following in a marked police vehicle.

¶ 13        Dr. Frederick Starr treated Lima at Cook County Hospital on February 25, 2019. Lima sustained two gunshot wounds to his torso and two gunshot wounds to his left arm. Dr. Starr opined that both sets of wounds were "through and through" wounds, caused by two separate bullets. Within ten minutes of arriving at Cook County Hospital, Lima was administered fifty micrograms of fentanyl for "pain control." Starr noted that while "it's hard to 100 percent predict what people's

response is to medications," based on Lima's stature it was likely that he would "still be able to answer questions and be lucid" after the dose of fentanyl.

¶ 14 Chicago Police Detective Bryan Cygnar and his partner Officer Paul Sznura interviewed Lima at Cook County Hospital and learned that there was only one shooter. Cygnar then assisted in canvassing the scene of the shooting but did not locate a firearm near the black Equinox on 947 North Lawndale. Cygnar located video footage from a POD camera located at the intersection of Monticello and Augusta, which was admitted into evidence. Cygnar explained that this video shows "the offender approaching the scene" at approximately 5:43 p.m. on February 25, 2019. The individual shown on the video is dressed in black with a hood over his head and appears to remove an item from a front pocket with his right hand while walking towards the scene.

¶ 15 Cygnar also located video surveillance footage from cameras at the house at 1020 North Monticello. Video footage from a backyard camera at the house was admitted into evidence. Cygnar explained that the video shows "a person running after [the] shooting through the vacant lot just north at about 1024 North Monticello." The individual shown on the video is dressed in black. Video footage from a camera "mounted on the garage facing the alley in *** a slight north direction" was also admitted into evidence. Cygnar explained that the video shows Hernandez's police vehicle driving north through the alley at 5:44:04 p.m.

¶ 16 Cygnar learned that "three possible offenders" were brought to the police station for questioning. Everyone, including Vickers, was placed into a separate interview room and the video recording devices were activated. Cygnar recovered a black hoodie and a black denim jacket from Vickers while processing him at the station. Cygnar later composed a photo array for Lipsey to show to Lima. Cygnar included a photo of Vickers because "[h]e was identified as the person running from the scene of the shooting with a firearm" by Hernandez.

¶ 17 Chicago Police Detective Mireya Lipsey was assigned to act as a "blind administrator" of

the photo array to Lima at Cook County Hospital on February 26, 2019, the day after the shooting. The responsibilities of a blind administrator include "showing and explaining a photographic lineup to a person without having any knowledge of the investigation that's going on at the time." Lipsey was not involved in the investigation prior to administering the array, did not create the array, and was not aware who was in the photo array. Lipsey, who was bilingual in English and Spanish, read the photo lineup advisory form to Lima in Spanish and let him review it himself. Lima declined to have the photo array recorded because of "[f]ear of retaliation."

¶ 18    Lipsey presented Lima with an array of six photographs and "explained if he saw anybody that he recognized, just to circle and put his initials and then explain what happened." Lima identified Vickers in the photo array and told Lipsey, "[t]he guy pointed a gun at his stomach. He ducked down, and the guy shot him then he ran north and then west through the vacant lot." Lipsey memorialized Lima's statement in Spanish and English on the photo advisory form. Lipsey said Lima appeared "alert" but "scared" throughout their interaction and did not seem to be under the influence of any drugs or painkillers.

¶ 19    Chicago Police Officer Kenneth Krupa recovered two bullets and seven fired .40-caliber cartridge casings between 1010 and 1020 North Monticello Avenue. Krupa did not find a firearm while searching the area. Forensic scientist Gregory Hickey determined that all seven cartridge cases were fired by the same firearm and both bullets were fired by the same firearm.

¶ 20    Chicago Police Detective Eddie Galloza administered a gunshot residue (GSR) kit to Vickers at approximately 7:00 p.m. on February 25, 2019, while Vickers was in the interview room at the police station. Galloza noted that when he entered the room to administer the test, Vickers "was wiping his hands" on his shirt and pants and "was very hesitant *** to do the test." Video footage from the interview room showing the GSR collection was admitted into evidence. The video first shows Vickers taking off a black jacket with a hood and a black shirt underneath.

Approximately five minutes later, Galloza begins to open the GSR kit in front of Vickers. Vickers immediately removes his hands from his pockets and wipes them on his face and together in front of his body. As Galloza prepares the kit, Vickers places his hands under his arms. Galloza reaches for Vickers' right hand and Vickers pulls away. Vickers conceals both hands behind his back against the wall. After approximately 18 seconds, Vickers puts his hands into the front of his pants. Vickers rubs his hands around in his pants until another officer enters the room and handcuffs his hands to the bench he is sitting on. When Galloza and the other officers leave the room, Vickers rubs the fingers on his right hand together and against his pants. Galloza later administers the GSR kit to Vickers.

¶ 21    Ruquiyah Wilson, a forensic scientist with the Illinois State Police, testified as an expert in trace chemistry. Wilson explained that she analyzes evidence under an electronic microscope to determine if it is "positive" for GSR. This involves analyzing evidence collected with GSR kits, which are administered by dabbing adhesive carbon tape on the back of the hand. In conducting this analysis, Wilson looks for primer gunshot residue (pGSR), which she explained is "the particulates expelled from the open end of a firearm when discharged, specific to the primer." A pGSR particle is a tricomponent particle made up of "lead, barium and antimony on one particle." Wilson said she needs "a minimum of three [pGSR] tricomponent particles and some consistent particles" to reach a "positive conclusion" that the given evidence contains GSR.

¶ 22    Wilson's analysis of the GSR kit in this case revealed one pGSR tricomponent particle on each of Vickers' hands. Accordingly, she was unable to reach a "positive result," concluding that "the individual may not have discharged the firearm. If he did, then the particles were removed by activity, weren't deposited, or weren't detected by the procedure." Wilson explained that particles could have been removed by washing, wiping, or movement such as running. Particles could also fail to be deposited after the discharge of a firearm if the area tested was covered by something or

the particles were not deposited on the tested area. Wilson further explained that "some ammunitions are lead-free" and some do not contain "antimony so they wouldn't be detected."

¶ 23    The prosecutor asked Wilson if a pGSR particle would ever be detected on an individual that did not discharge firearm. Over defense counsel's objection, Wilson testified that "if there was not a discharged firearm or an individual wasn't in the environment of a discharged firearm or came in contact with pGSR-related items, no, an individual should not have pGSR." On cross-examination, Wilson acknowledged that GSR is detectable on clothing and transferable between surfaces "[b]y any type of activity or contact," including, as defense counsel noted, "by handcuffs." The State rested following Wilson's testimony.

¶ 24    Amber Brown, the mother of Vickers' daughter, testified that at approximately 4:45 p.m. on February 25, 2019, Vickers came to her house to see their daughter. Brown lived at 1040 North Springfield, approximately four blocks from Lawndale. Their daughter was still at school, so Vickers left at approximately 5:30 p.m. Brown did not see Vickers with a weapon that evening and said that he was "in a good mood." When Vickers left the house, he told Brown he was taking the bus home.

¶ 25    The jury found Vickers guilty of attempt first degree murder, aggravated battery, and aggravated discharge of a firearm, and found that he personally discharged a firearm while committing attempt first degree murder that proximately caused great bodily harm to another person.

¶ 26                              B. Sentencing

¶ 27    At Vickers' sentencing hearing, the trial court noted that the sentencing range for Vickers' attempt first-degree murder conviction was six to 30 years' imprisonment and that it was subject to a firearm enhancement that required the imposition of an additional 25 years to life, for a total sentencing range of 31 years to life imprisonment. The parties agreed that Vickers' aggravated

battery conviction involved a victim over the age of 60 and was subject to an extended term sentence of six to 30 years' imprisonment, and that the range for Vickers' aggravated discharge of a firearm offense was four to 15 years' imprisonment. The State did not ask the trial court "to make a finding of severe bodily injury to trigger consecutive sentencing." Therefore, the sentences for aggravated battery and aggravated discharge of a firearm would be served concurrently with Vickers' sentence for attempt murder.

¶ 28    In aggravation, the State presented a victim impact statement from Lima in which he described the physical, emotional, mental, and financial harm suffered because of the shooting. Lima detailed his lengthy hospitalization, the arduous healing process, his loss of sleep, and noted, "[m]y body shakes and suffocates at the attempts that I make to incorporate myself to be able to proceed with my regular routine." The State also played a video of the shooting and emphasized Vickers' criminal history, that his conduct "caused or threatened serious harm" pursuant to 730 ILCS 5/5-5-3.2, and Lima's age at the time of the offense.

¶ 29    Vickers' mother and fiancé testified in mitigation. Vickers made a statement in allocution, apologizing to Lima for what he had been through, but maintained his innocence.

¶ 30    The trial court sentenced Vickers to 15 years' imprisonment for attempt murder and added the minimum of 25 years for the mandatory firearm enhancement. The court sentenced Vickers to 15 years for aggravated battery and 15 years for aggravated discharge of a firearm, which merged into and ran concurrently with Vickers' aggregate 40-year sentence for attempt murder. In imposing sentence, the court noted that it had considered the presentence investigation report, the evidence presented, Vickers' statement in allocution, the arguments of the parties, and "all statutory and nonstatutory factors in aggravation and mitigation, whether specifically mentioned or not in the history and character of the defendant, having due regard for the seriousness of the offense and with the objective of restoring the defendant useful of [*sic*] citizenship."

¶ 31    In aggravation, the court found "that the defendant's conduct caused or threatened serious harm. In fact, serious harm to the victim in this matter, Mr. Lima, who is 60 years of age and above older, a senior citizen." The court also reviewed Vickers' criminal history, noting that his previous convictions were either misdemeanors or drug-related but that he had previously been sentenced to both probation and a term of imprisonment after violating probation. The court stated that it considered Vickers' age, close relationship with his three daughters, and the "heartfelt" testimony from his mother and fiancé in mitigation. Ultimately, the court found that Vickers "pose[s] a significant risk to the community, that outweighs the risk of harm from [his] removal from [his] family and [his] children."

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, Vickers argues (1) he was not proven guilty of attempt first degree murder, aggravated battery, and aggravated discharge of a firearm beyond a reasonable doubt; (2) the trial court erred in admitting a hearsay statement of identification under 725 ILCS 5/115-12; (3) his defense counsel provided ineffective assistance in failing to "carry through on a promise to the jury" made during his opening statement and failing to adequately cross-examine the State's expert witness on gunshot residue; and (4) the trial court considered an improper factor in aggravation when imposing his sentence.

¶ 34                            A. Sufficiency of the Evidence

¶ 35    Vickers first argues that the State failed to prove him guilty of all three offenses. Vickers does not challenge whether the offenses occurred, but whether the State proved that he was the individual that shot Lima. Vickers asserts there was no physical evidence connecting him to the offenses; there was no firearm recovered, none of the videos showed his face, and "Lima's photo array identification was the only evidence identifying Vickers as the offender." As such, the State did not prove him guilty beyond a reasonable doubt.

¶ 36    In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not retry Vickers or substitute our judgment for that of the jury on the weight of the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. " '[A] fact finder's decision to accept testimony is entitled to deference' " and "it is for the fact finder to judge how flaws or contradictions on the part of a witness's testimony affect the credibility of the testimony in its totality." *In re O.F.*, 2020 IL App (1st) 190662, ¶ 25 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007)). "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 37                    1. *Identification*

¶ 38    Vickers first challenges the reliability of Lima's identification testimony. It is well-established that the State may meet its burden of proving a defendant's guilt through the testimony of a single, credible eyewitness, if the witness viewed the offender under circumstances permitting a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307 (1989); *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 88. It is for the trier of fact to determine the reliability of identification testimony in light of all the facts and circumstances, including the factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972) and adopted in *Slim*, 127 Ill. 2d at 307-308. In evaluating the likelihood of misidentification, we consider the totality of the evidence and the following five factors: (1) the witness's opportunity to view the suspect; (2) the witness's degree of attention; (3) the accuracy of any prior descriptions provided; (4) the witness's level of certainty at the time of the identification procedure; and (5) the length of time between the crime

and the identification. *Biggers*, 409 U.S. at 199-200. "No single *Biggers* factor by itself conclusively establishes the reliability of identification testimony; instead, the trier of fact must consider all the factors." *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22.

¶ 39     Vickers first argues that Lima did not have a sufficient opportunity to view the offender's face during the shooting. When considering this factor, we examine "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40. Vickers asserts that "Lima admitted at trial that he did not see the shooter's face" and that "[t]his alone renders his identification of Vickers unreliable."

¶ 40     First, we reiterate that no single *Biggers* factor is dispositive as to the reliability of a witness. *Macklin*, 2019 IL App (1st) 161165, ¶ 22. Furthermore, Lima testified on redirect that there was nothing covering the shooter's face and explicitly stated that he could see the shooter's face as he ran by. The surveillance video shows Lima turn towards Vickers after the initial gunshots at the silver car and Vickers run past Lima in close proximity. The brief nature of the encounter was not fatal to Lima's identification. See, *e.g.*, *People v. Herrett*, 137 Ill. 2d 195, 204 (1990) (affirming where the witness only had "several seconds" to observe the defendant). It was within the province of the jury to judge how any contradiction in Lima's testimony affected the credibility of his testimony as a whole. See *In re O.F.*, 2020 IL App (1st) 190662, ¶ 25.

¶ 41     Vickers argues that the second factor, Lima's degree of attention, also weighs against the reliability of the identification because witnesses generally "tend to focus on weapons and not on the faces of the offenders." Vickers relies on *State v. Henderson*, 27 A.3d 872 (N.J. 2011), in which the New Jersey court conducted a review of scientific research, including a consideration of how memory works, in response to the defendant's claim the lineup procedure identifying him was impermissibly suggestive. *Id.* at 892-914. While courts in Illinois have recognized this out-of-state

decision, they have not departed from the original *Biggers* factors to evaluate eyewitness identification testimony. Furthermore, Vickers does not point to anything in the record supporting that the generalizations of *Henderson* and other cases citing sociological studies were true for Lima specifically. Although the encounter was relatively short, surveillance video footage from 1020 North Monticello reflects that the shooter was alone while running from the silver car, closely past Lima, and north on Monticello. Lima also testified he saw Vickers shoot at the car before he ran past him. Nothing indicates that Lima was distracted or that his attention was anywhere except the gunman.

¶ 42    The third factor, the accuracy of the witness's prior description, does not favor either party in this case because there was no testimony that Lima ever provided a prior description of the gunman. See *In re T.B.*, 2020 IL App (1st) 191041, ¶ 49 (because there was no evidence about any prior description from the witnesses, "[t]his factor favors neither party"). The search for the gunman and apprehension of Vickers was based entirely on the observations of Henderson and other police officers.

¶ 43    Next, Vickers argues that the fourth factor, the witness's level of certainty in their identification, "does nothing to indicate that the identification was reliable." When asked to make an in-court identification of the man who shot him more than three years ago, Lima replied, "No, I just know. I don't remember now." Lima's cousin Donis explained that damage from the shooting impaired Lima's ability to communicate and remember things, making his "mind absent" in a way that it was not prior to the shooting. Further, it is reasonable to infer Lima may have been scared to identify Vickers in court, just as he feared retaliation in 2018 when he refused to have the photo array recorded.

¶ 44    Even though Lima did not identify Vickers in court, Lima identified Vickers during his first opportunity to do so – in a photo array at the hospital the day after the shooting – as "the guy"

who pointed a gun at his stomach and shot him. At trial, Lima explained that he identified Vickers in the photo array as "the one who shoot [*sic*] me."

¶ 45    Vickers contends that "the U.S. Supreme Court has long held that a witness's 'degree of certainty in making [an] identification is worthless as an indicator that he is correct.' " Quoting *Manson v. Brathwaite*, 432 U.S. 98, 130 (1977). However, courts in Illinois have continued to utilize the original *Biggers* factors, including the witness's level of certainty, to evaluate identification testimony. Again, it was the fact finder's responsibility to evaluate any flaws in Lima's testimony, and we do not find that this factor undermines the jury's decision.

¶ 46    The final factor, the length of time between the crime and the confrontation, also does not weigh against the reliability of the identification. Citing a sociological study that is not a part of the record, Vickers claims that the "approximately 20 hours" between the shooting and Lima's identification would have led to "a decline in memory prior to viewing the photo array." This study was not entered into evidence at trial and not considered by the fact finder. Consideration of this study on appeal would be improper. See *People v. Mehlberg*, 249 Ill. App. 3d 499, 530-32 (1993) (the defendant's claim that bar journal, law review, and other articles were offered to assist the reviewing court in reviewing issues related to a complicated, technical, and newly emerging scientific field was rejected, finding instead that they were offered in "an attempt to interject expert-opinion evidence into the record to impeach the expert testimony" of the State's witnesses, where such materials were "never subject to cross-examination by the State" and were "never considered by the trial court."). Nevertheless, reviewing courts have found that even longer periods of time do not automatically render the identification unreliable. See, *e.g.*, *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 79 (period four days "weighs in favor of reliability"); *People v. Simmons*, 2019 IL App (1st) 131300, ¶ 97 (two weeks); *People v. Cox,* 377 Ill. App. 3d 690, 699 (1st Dist. 2007) (two months); *People v. Miller*, 254 Ill. App. 3d 997, 1009 (1st Dist. 1993) (four months).

This factor also does not undermine the jury's determination.

¶ 47    Vickers asserts Lima's identification was unreliable because he "knew he was identifying the person that the police arrested." The record fails to support this claim where video surveillance shows that Donis drove Lima away from the scene and to the hospital before any police arrived near 1016 North Monticello. Further, the photo array was administered by Detective Lipsey as a "blind administrator" who had no knowledge of the identity of the suspected shooter.

¶ 48    Vickers also claims Lima made the identification while "almost certainly *** under the influence of drugs." However, this is contradicted by Starr's opinion that it was likely that Lima would "still be able to answer questions and be lucid" after the small dose of fentanyl he received at the hospital to manage his pain. Lipsey also testified Lima was "alert" throughout their interaction and did not seem to be under the influence of any drugs or painkillers.

¶ 49    In sum, after considering the entirety of the evidence and all five *Biggers* factors, we find no basis to substitute our judgment for that of the jury's, particularly in light of the corroborating evidence.

¶ 50                    2. *Corroboration by Other Evidence*

¶ 51    The State's evidence amounts to more than just Lima's identification of Vickers. Hernandez testified that at around 5:43 p.m., immediately after he heard gunshots a block away, he saw Vickers running through the alley towards his vehicle, dressed in black, and holding a gun. Hernandez briefly lost sight of Vickers when he "had to reverse" his vehicle, but soon saw Vickers again approximately five to ten yards away and "saw the front of his body *** saw his face, and *** saw his hand." Eventually, Hernandez exited his car and chased Vickers on foot, losing sight of Vickers for a "few seconds" until Vickers jumped in the black Equinox and was apprehended shortly thereafter.

¶ 52    Hernandez's account was largely corroborated by dashcam video and video security

footage from nearby homes and POD cameras. Video from a POD camera on Monticello shows an individual dressed in black walking towards the eventual scene of the shooting at approximately 5:43 p.m. and removing something from his pocket. Video from the home at 1020 North Monticello depicts the individual shooting at the silver car at 5:43:51 p.m. and shooting at Lima as he ran by at 5:43:56. Dashcam video from Hernandez's vehicle shows him drive through the alleyway and briefly pause at 5:44:03 p.m. when he exited the vehicle to chase Vickers on foot and his partner "took control of the driver's seat." Video from the garage of 1020 North Monticello shows the police vehicle drive by at 5:44:04 p.m. Video from the backyard camera at 1020 North Monticello shows an individual in black running through the vacant lot at the same time, 5:44:04 p.m. Video from a POD camera at Augusta and Ridgeway depicts an individual dressed in black running southbound on Lawndale Avenue across Augusta Boulevard and Officer Hernandez running after him approximately five seconds later. Taken together, the videos show a single individual dressed in black approaching the scene, firing gunshots into the silver car, shooting Lima, running north on Monticello, then running through vacant lots and across Augusta Boulevard while fleeing police officers.

¶ 53    Vickers asserts that there was no "physical or forensic evidence" connecting him to the shooting. Even if this were true, this court has repeatedly found that where a witness's testimony is credible, the State is not required to present additional physical evidence to link a defendant to a firearm. *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 33. In this case, Lima identified Vickers as the man who shot him, and Hernandez identified Vickers as the individual he chased and apprehended immediately after the shooting. The State was not required to present any additional physical evidence to prove Vickers guilty.

¶ 54    As the State argued to the jury, Vickers' time in the interview room at the police station after his arrest could explain some of the absence of physical evidence. Galloza testified that when

he entered the room to administer the GSR test, Vickers "was wiping his hands" on his shirt and pants and "hesitant" to do the test. Video from the room shows Vickers rubbing his hands together, rubbing them over his face, placing them under his arms, in his pockets, and down the front of his pants, pulling them away from Galloza, and rubbing his fingers together when the officers leave the room. Written description may not paint a complete picture, but it is readily apparent from the video that the aim of Vickers' actions in the interview room was to remove whatever residue may have been on his hands.

¶ 55        Furthermore, the failure to recover the firearm used in an offense is not inherently fatal to proving the offense beyond a reasonable doubt. See, *e.g.*, *People v. Washington*, 2012 IL 107993, ¶¶ 28-37 (although the gun used in the armed robbery was not recovered, a witness's "unimpeached and uncontroverted testimony" was sufficient to prove that a gun was present during the commission of the offense). In this case, it is undisputed that a single firearm was used. That the firearm could not be located does not render the evidence presented at trial "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *Collins*, 214 Ill. 2d at 217. The State argued in closing argument that Vickers had "ample opportunity" to dispose of the gun when Hernandez twice lost sight of him during the chase. Also, the path of flight was "by no means secure" because of the "crowd gathering" after the shooting. The jury was free to accept or reject this argument in the face of the evidence presented. After reviewing all the evidence and reasonable inferences drawn therefrom in the light most favorable to the State, we find no reason to disturb the jury's determination.

¶ 56                                B. Prior Statement of Identification

¶ 57        Next, Vickers argues it was error for Lipsey to testify that Lima identified Vickers in the photo array and described him as "the guy [that] pointed a gun at his stomach. He ducked down, and the guy shot him then he ran north and then west through the vacant lot." Vickers contends

that while the identification was admissible, the "out-of-court description of the shooter's behavior goes beyond the scope" of admissible hearsay under 725 ILCS 5/115-12. We agree with the State that such testimony did not violate the prohibition against prior consistent statements but was a properly admitted statement of identification.

¶ 58    Generally, evidentiary rulings are within the discretion of the trial court, and we will not reverse the trial court's ruling absent an abuse of discretion. *People v. Caffey*, 205 Ill.2d 52, 89 (2001). Proof of a prior consistent statement made by a witness is inadmissible hearsay when used to bolster a witness's testimony. *People v. Heard*, 187 Ill.2d 36, 70 (1999). However, prior statements of identification are admissible under Illinois Rule of Evidence 801(d)(1)(B) (eff. Oct. 15, 2015) and section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-12). Section 115-12 provides, "[a] statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12.

¶ 59    Courts have "read section 115-12 broadly to encompass the entire identification process" and "a witness may include with the statement of identification a short summary description of the conduct of the identified person, made contemporaneously with the identification, but 'only to the extent necessary to make the identification understandable to the jury.' " *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 86 (quoting *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 42). "[T]he declarant's prior out-of-court identification of the defendant is admissible as substantive evidence, regardless of whether it corroborates the declarant's in-court identification of the defendant or is instead introduced 'as a substitute for in-court identification or to bolster a weak one.' " *People v. Neal*, 2020 IL App (2d) 170356, ¶ 33 (quoting Michael H. Graham, Handbook of Illinois Evidence § 801.13, at 969 (2020 ed.)). "The statute does not expressly require the declarant to testify on the

out-of-court identification before a third party may testify about that identification." *People v. Lewis*, 223 Ill. 2d 393, 403 (2006).

¶ 60 Vickers' contention that Lipsey's testimony regarding Lima's statement of identification "improperly bolstered the State's case" is based largely on this court's decision in *People v. Anderson*, 2018 IL App (1st) 150931 and the Second District's decision in *People v. Guerrero*, 2021 IL App (2d) 190364. We find the facts of both distinguishable.

¶ 61 In *Anderson*, a witness who saw the defendant holding a firearm testified at trial regarding the written identifications he made on defendant's photo in photo arrays. *Id.* ¶ 9. The State then displayed the photo arrays with the annotations on a video screen twice during direct examination and again in its closing argument. *Id.* ¶ 36. On appeal, the court found that testimony about what the witness wrote on the photo arrays was admissible under section 115-12 of the Code, but it was improper for the State to display the writing on three separate occasions, thus using the prior statements "essentially as a demonstrative exhibit." *Id.* ¶¶ 47-48. In doing so, the court held that when admitting a prior identification as substantive evidence under section 115-12, the testimony "may include a description 'only to the extent necessary to make the identification understandable to the jury,' but it may not go beyond that to provide 'detailed accounts of the actual crime.' " *Id.* ¶ 42 (quoting *Brown v. U.S.*, 840 A.2d 82, 89 (D.C. 2004)). Unlike in *Anderson*, the State did not use Lima's prior statement of identification as a "demonstrative exhibit," but as an aid to explain Lima's identification of Vickers in the photo array.

¶ 62 In *Guerrero*, an eyewitness testified at trial that he had previously identified the defendant to police in a photo array as "Monster," but denied telling police that he saw the defendant throw a rock at the victim. *Guerrero* 2021 IL App (2d) 190364, ¶ 85. The court later allowed a police detective to testify that the witness *had* identified the defendant in the photo array as "as the person who threw the rock at and struck" the victim, even though the State did not confront the witness

with his prior inconsistent statement. *Id.* The reviewing court found that the admission of the detective's testimony "essentially allowed the State to get in through section 115-12 what it could not (or did not even attempt to) get in through section 115-10.1," specifically, the witness's prior statement that he saw the defendant throw a rock at and strike the victim. *Id.*

¶ 63 In this case, Lipsey's recitation of Lima's statement, which was also written in English and Spanish on the photo array advisory form and entered into evidence without objection, did not go "far beyond the substance of Lima's own testimony" as Vickers suggests. Lima had already testified that he identified defendant in the photo array as "the one who shoot [*sic*] me." As such, we do not find that the State was attempting "to bypass the requirements of section 115-10.1." *Guerrero*, 2021 IL App (2d) 190364, ¶ 86. Rather, the statement was a "short summary description" of Vickers' conduct made contemporaneously with the identification, which is permissible under the circumstances. See *Guerrero* 2021 IL App (2d) 130364, ¶ 86. Recall, three years after the shooting and after his mind was "damage[d]," Lima was unable to make an in-court identification of Vickers. The "short summary description" made at the time of the photo array, was undoubtedly useful to make the identification "understandable to the jury." *Anderson*, 2018 IL App (1st) 150931, ¶ 42. The trial court did not err when it admitted Lipsey's testimony of Lima's prior statements of identification into evidence.

¶ 64 C. Ineffective Assistance of Counsel

¶ 65 Vickers next argues his trial counsel rendered ineffective assistance by (1) failing to call two unidentified witnesses that he "promised" to call during opening statement and (2) failing to "adequately challenge" Wilson's testimony regarding her GSR analysis. We disagree.

¶ 66 A defendant alleging ineffective assistance of counsel "must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a

reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability is a probability which undermines confidence in the outcome of the trial." *People v. Sturgeon*, 2019 IL App (4th) 170035 ¶ 84. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 67 Effective assistance of counsel refers to competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Thus, Vickers must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010). "Decisions involving what evidence to present and which witnesses to call fall within the broad category of trial strategy and are not subject to a claim of ineffective assistance unless they deprive a defendant of a meaningful adversary proceeding." *People v. Smith*, 2012 IL App (1st) 102354, ¶ 86 (citing *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005)). It is well settled "that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). A mistake in trial strategy or an error in judgment will not render representation constitutionally defective. *Id.* at 355-356. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.*

¶ 68         1. *Opening Statement*

¶ 69 Vickers first contends that his trial counsel was ineffective because his opening statement "promised" the jury that they "would hear evidence that when Vickers heard the shooting, 'he was walking to the bus and he gets into a car with two people he knows,' " but "presented no evidence

to support his assertion that Vickers got into a car with people he knew to escape the shooting." The State maintains that no such promise was made and, therefore, defense counsel did not promise evidence that he did not deliver. We agree.

¶ 70     Defense counsel may be ineffective "where he promises the testimony of a particular witness during opening statements but does not provide that promised testimony at trial." *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 50. However, defense counsel's failure to present the testimony promised in an opening statement does not constitute *per se* ineffective assistance. *Id.* Instead, counsel's decision to "abandon a trial strategy during trial may be reasonable under the circumstances and that the decision not to provide promised testimony may be warranted by unexpected events." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 80.

¶ 71     In this case, defense counsel made no explicit or implicit promise in his opening statement to produce any testimony at trial. Defense counsel stated, in relevant part:

> "There is a chase. He hears the shooting. When he was walking to the bus and *he gets into a car with two people he knows*, subsequent to that there is an arrest, a rough arrest, and by a rough arrest, you will see that they pull him out of the car and hit him and kick him, which is irrelevant, but the important part of that they are screaming, where is the gun? Where is the gun? Where's the gun? He's got a telephone. He is got an iPhone in his hand, not a gun, and he moved, not only back towards where the shooting took place, but he was hiding from the shooting that was going on as everybody in the neighborhood was." (Emphasis added.)

¶ 72     While defense counsel mentions that Vickers got into the black Equinox "with two people he knows," he never promised they would testify. This alone undermines Vickers' argument and distinguishes the facts of this case from those Vickers relies on in support. See *People v. Patterson*, 192 Ill. 2d 93, 120 (2000) (defense counsel "told the jury that they would hear evidence that

defendant confessed only because the police beat him up and tried to suffocate him with a plastic bag"); *People v. Briones*, 352 Ill. App. 3d 913, 915 (2000) (defense counsel stated, "[The defendant] has no obligation to testify. * * * But he's going to get up here on this witness stand and he's going to testify and he's going to tell you the truth and he's going to subject himself to rigorous cross-examination by the State and he's going to do that because he's going to tell you the truth"); *People v. Lewis*, 240 Ill. App. 3d 463 (1992) (defense counsel "told the jury that defendant gave a pretrial statement" admitting that he and another individual stabbed the victim and that the jury would have to determine "who produced the fatal blow"); *Alcala v. Woodford*, 334 F.3d 862, 873 (9th Cir. 2003) (trial counsel told the jury "that he would prove that [the defendant] was at Knott's Berry Farm on the afternoon of June 20, 1979, and utterly failed to do so"). Based on the totality of the record, Vickers has not convinced us that his counsel's performance was unreasonable or his assistance ineffective.

¶ 73                                     2. *Cross-Examination*

¶ 74        Vickers also contends that counsel rendered ineffective assistance in his cross-examination of Wilson. Specifically, Vickers faults counsel for failing to "present, or question Wilson about, scientific studies and FBI reports that document the presence of GSR particles on surfaces in Chicago police stations and in Chicago police vehicles, and which show that this tricomponent particle is not exclusive to GSR." The State maintains that Vickers has failed to meet his burden in establishing that counsel's performance was deficient because "the record is silent about *** the reasons behind counsel's inaction and *** the application of such studies to the specific facts of this case."

¶ 75        "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). The manner in which to cross-examine a particular witness

involves the exercise of professional judgment, which is entitled to substantial deference from a reviewing court. *Id.* Trial counsel renders ineffective assistance in cross-examining witnesses only if his approach is objectively unreasonable. *Id.* at 327. Notwithstanding Vickers' argument that cross-examination might have been handled differently, we cannot say that trial counsel's approach fell outside the wide range of reasonable professional assistance in this case.

¶ 76       There are numerous ways counsel could have proceeded in cross-examining Wilson, but there are also numerous reasons why he may have chosen not to cross-examine Wilson in that manner. For example, counsel may have made the strategic choice not to delve further into the scientific minutiae of GSR testing after Wilson had already acknowledged that her analysis was unable to reach a "positive result." She also concluded that Vickers "may not have discharged the firearm," and admitted that GSR is detectable on clothing and transferable between surfaces "[b]y any type of activity or contact," including "by handcuffs." Regardless, we do not find defense counsel's trial strategy was "so unsound that he entirely fail[ed] to conduct meaningful adversarial testing of the State's case." *Perry*, 224 Ill. 2d at 355-56.

¶ 77                                D. Sentencing

¶ 78       Finally, Vickers argues the trial court erred when it relied on the fact that his conduct "caused or threatened serious harm in aggravation" when imposing his sentence for attempt first degree murder, even though "[t]his factor was inherent to the offense as charged."

¶ 79       Vickers admits he failed to preserve this issue for review but urges us to review his claim under the plain error doctrine. The plain error doctrine allows us to consider unpreserved error if Vickers shows that the evidence at the sentencing hearing was closely balanced, or that the error was so egregious as to deny him a fair sentencing hearing. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Vickers has shown no error, let alone plain error, to excuse his forfeiture of the issue.

¶ 80       The State charged Vickers with attempt first degree murder in that he, without lawful justification and with intent to kill, "[s]hot Adelso Lima about the body while armed with a firearm, which constituted a substantial step toward the commission of first degree murder, and during the commission of the offense, Antonio Vickers personally discharged a firearm that proximately caused great bodily harm to Adelso Lima." See 720 ILCS 5/8-4(a); 720 ILCS 5/9-1(a)(1). Attempt first degree murder is a Class X offense, and the sentencing range is six to 30 years' imprisonment. 720 ILCS 5/8-4(c)(1); 730 ILCS 5/5-4.5-25(a). Vickers received 15 years.

¶ 81       Additionally, "an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/8-4(c)(1)(D). This mandatory firearm enhancement shall be added to the baseline term of imprisonment for attempt first degree murder. *People v. Taylor*, 2023 IL 128316 ¶ 61.

¶ 82       The imposition of a sentence normally is within a trial court's discretion, and "there is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, such that the trial court's sentencing decision is reviewed with great deference." *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 83       In general, the court may not consider a factor implicit in the offense as an aggravating factor in sentencing. *People v. Phelps*, 211 Ill.2d 1, 12 (2004). However, "the trial court is not required to refrain from any mention of the factors which constitute elements of an offense, and the mere reference to the existence of such a factor is not reversible error." *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 15.

¶ 84       "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on

a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). "It is the defendant's burden to affirmatively establish that the sentence was based on improper considerations, and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improperly imposed." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49 (internal citations omitted).

¶ 85    Vickers has not met his burden to affirmatively establish that the sentence the trial court imposed was based on the improper consideration of a factor implicit in the offense as an aggravating factor. In imposing sentence, the trial court stated, "I find the following factors in aggravation: Specifically, that the defendant's conduct caused or threatened serious harm. In fact, serious harm to the victim in this matter, Mr. Lima, who is 60 years of age and above older, a senior citizen." This is in accordance with the statutorily enumerated factors to be considered in aggravation when imposing sentence (*e.g.*, whether "the defendant's conduct caused or threatened serious harm"). See 730 ILCS 5/5-5-3.2(a)(1).

¶ 86    Vickers focuses on just these few words in arguing the trial court erroneously considered in aggravation the fact that Vickers' conduct "caused or threatened serious harm," which is implicit in the offense. However, the trial court also focused on other statutorily enumerated factors, including Vickers' "prior delinquency or criminal activity" (*id.* § (a)(3)), that the sentence was necessary to "deter others from committing the same crime" (*id.* § (a)(7)), and that Vickers "committed the offense against a person 60 years of age or older." *Id.* § (a)(8). See *Andrews*, 2013 IL App (1st) 121623, ¶ 15 (the trial court does not err by merely referencing the existence of an enumerated sentencing factor in aggravation).

¶ 87    Taken as a whole, the record demonstrates the court was commenting on proper factors and did not improperly rely on a factor inherent in the offense when it made its sentencing decision. See *Dowding*, 388 Ill. App. 3d at 943 ("a court of review should consider the record as a whole,

rather than focusing on a few words or statements by the trial court"). Therefore, we affirm Vickers' sentences.

¶ 88                                    III. CONCLUSION

¶ 89        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 90        Affirmed.